RATTET, PASTERNAK & GORDON-OLIVER, LLP
Proposed Attorneys for the Debtor
550 Mamaroneck Avenue
Harrison, New York 10528
(914) 381-7400

Jonathan S. Pasternak
Dawn K. Arnold

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re:                                              Chapter 11
                                                    Case No. 10 - (RDD)
YEARBOOK PHOTOGRAPHY OF
MAMARONECK, INC.
d/b/a Davis Studio,

                        Debtor.
-------------------------------------------------------------X

## DECLARATION OF ROXANNE DAVIS PURSUANT TO LOCAL RULE 1007-2

Roxanne Davis, being duly sworn, deposes and says:

1.      I am the Vice President of Yearbook Photography of Mamaroneck, Inc. d/b/a Davis

Studio (the "Debtor"), and I submit this affidavit pursuant to Rule 1007-2 of the Local Rules for the

United States Bankruptcy Court for the Southern District of New York.

## BACKGROUND

2.      The Debtor is a privately owned family business that provides portrait, candid and

digital photography services to nursery, elementary, middle and high schools and colleges and

universities throughout the New York Metropolitan area. The Debtor is well known throughout

the Westchester school communities as a respected and quality provider of school related

photography and portrait services.

3.      The Debtor's offices are currently located at 155 White Plains Road, Tarrytown, New

York 10591. The Debtor also leases premises at 4355 Hylan Blvd., Staten Island, NY 10312.

4.      The Debtor's bankruptcy filing was precipitated by a combination of factors dating all the way back to a severe flash flood which destroyed its prior premises in Mamaroneck in 2007, as well as large but necessary capital investments in digital photograph technology. Moreover, the Debtor's current financial difficulties have been compounded by the severe economic recession which has directly affected the school photography business across the entire country.

5.      The significant downturn in the Debtor's revenues, especially during 2009, combined with the exhaustion of available capital has left the Debtor unable to sustain its operations for longer than the next approximate sixty (60) days, without either an immediate infusion of new capital or a strategic transaction such as a sale of its business. In addition, the Debtor has no availability under its current line of credit with JPMorgan Chase Bank.

6.      To that end, the Debtor has been frantically searching for potential "white knights" and potential purchasers, and has in fact recently entered into a contract of sale, subject to this Court's approval and higher and better bids, with Herff Jones, Inc. ("Purchaser"), a well capitalized and well known firm already in the school photography business throughout the Midwest, for a sale of the Debtor's customer accounts and related good will and intangibles. A copy of the Asset Purchase Agreement entered into between the parties, subject to higher and better bids to be solicited and procured through an auction process to be approved by the Bankruptcy Court, is annexed hereto as **Schedule IV**.

7.      With the assistance of this Court, the Debtor is confident that it will be able to maximize the value of the business for the benefit of its creditors.

8. The needs and interests of the Debtor's creditors will best be served by the continued possession of its property and management of its affairs as Debtor-in-Possession under Chapter 11 until confirmation of a reorganization plan.

## INFORMATION REQUIRED BY LOCAL BANKRUTPCY RULE 1007

9. In addition to the foregoing, Local Bankruptcy Rule 1007-2 requires certain information related to the Debtor, which is set forth below.

**Local Rule 1007-2(a)(1)**

10. The Debtor is located at 155 White Plains Road, Tarrytown, New York, 10591, and is engaged in the photography industry. The Debtor also operates from premises located at 4355 Hyaln Blvd., Staten Island, NY 10312.

**Local Rule 1007-2(a)(2)**

11. This case was not originally commenced under Chapter 7 or 13 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

**Local Rule 1007-2(a)(3)**

12. Upon information and belief, no committee was organized prior to the order for relief in this Chapter 11 case.

**Local Rule 1007-2(a)(4)**

13. A list of the names and addresses of the Debtor's 20 largest unsecured claims, excluding those who would not be entitled to vote at a creditors' meeting and creditors who are "insiders" as that term is defined in 11 U.S.C. Section 101(31) is annexed hereto as **Schedule I**.

**Local Rule 1007-2(a)(5).**

14.     A list of the names and addresses of the five largest secured creditors is annexed hereto as **Schedule II**.

**Local Rule 1007-2(a)(6)**

15. A balance sheet will be filed separately pursuant to the requirements set forth in 11 U.S.C. §521(a).

**Local Rule 1007-2(a)(7)**

16.     There are no publicly held securities of the Debtor.

**Local Rule 1007-2(a)(8)**

17.     None of the Debtor's property is in the possession of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or any agent for such entity.

**Local Rule 1007-2(a)(9)**

18.     The Debtor leases an office premises located at 155 White Plains Road, Tarrytown, New York, 10591, for which the Debtor has written lease for the period of May 1, 2007 to June 30, 2017 as well as premises located at 4355 Hylan Blvd., Staten Island, NY 10312.

**Local Rule 1007-2(a)(10)**

19.     The Debtor's assets and records are located at its principal place of business at 155 White Plains Road, Tarrytown, New York, 10591.

**Local Rule 1007-2(a)(11)**

20.     There are no actions or proceedings pending against the Debtor.

**Local Rule 1007-2(a)(12)**

21.     The Debtor's senior management currently includes:

- Roxanne Davis, Vice President.
- Greg Davis, Vice President.

**Local Rule 1007-2(b)(1) and (2)**

22.     The Debtor's estimated weekly payroll to employees for the thirty (30) day period following the Chapter 11 petition is $172,000.

23.     The Debtor's estimated weekly payroll and payments to officers, stockholders, and directors for the thirty (30) day period following the Chapter 11 petition is $12,924.

24.     **Local Rule 1007-2(b)(3)**

### 30 Day Cash Receipts and Disbursements

See attached **Schedule III**

### CONCLUSION

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

By: _/s/ Roxanne Davis_____

Roxanne Davis, Vice President

# SCHEDULE I

## 20 largest Unsecured Creditors

**See Attached.**

# United States Bankruptcy Court
## Southern District of New York

In re  __Yearbook Photography of Mamaroneck, Inc.__

Debtor(s)

Case No. _____

Chapter  __11__

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

Following is the list of the debtor's creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 [*or* chapter 9] case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. If a minor child is one of the creditors holding the 20 largest unsecured claims, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

| (1)<br><br>*Name of creditor and complete mailing address including zip code* | (2)<br><br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br><br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br><br>*Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | (5)<br><br>*Amount of claim [if secured, also state value of security]* |
|---|---|---|---|---|
| 4349 Holdings, LLP<br>6247 Amboy Road<br>Staten Island, NY 10309 | 4349 Holdings, LLP<br>6247 Amboy Road<br>Staten Island, NY 10309 | Rent Due to Landlord | | 5,248.97 |
| Adorama<br>42 West 18th St.<br>New York, NY 10011 | Adorama<br>42 West 18th St.<br>New York, NY 10011 | Vendor | | 625.75 |
| Alden Staffings Solutions<br>108 Corporate Park Drive<br>White Plains, NY 10604 | Alden Staffings Solutions<br>108 Corporate Park Drive<br>White Plains, NY 10604 | Temporary Employment Agency Payable | | 1,716.58 |
| American Express | American Express | Credit Card | | 1,000.00 |
| B. Oshrin, Ltd.<br>22 Meadow Ponds Circle<br>NY 11674 | B. Oshrin, Ltd.<br>22 Meadow Ponds Circle<br>NY 11674 | Vendor | | 3,339.06 |
| Bloom and Streit LLP<br>2900 Westchester Avenue<br>Purchase, NY 10577-2537 | Bloom and Streit LLP<br>2900 Westchester Avenue<br>Purchase, NY 10577-2537 | Accountants | | 3,700.00 |
| CITRIX Online<br>File 50264<br>Los Angeles, CA 90074-0264 | CITRIX Online<br>File 50264<br>Los Angeles, CA 90074-0264 | | | 1,236.00 |
| Crescent Associates of NY, LLC<br>327 Mamaroneck Avenue<br>Lower Level<br>White Plains, NY 10605 | Crescent Associates of NY, LLC<br>327 Mamaroneck Avenue<br>Lower Level<br>White Plains, NY 10605 | Rent and Utilities Due to Landlord | | 60,237.00 |
| Easman Kodak Company<br>P.O. Box 642166<br>Pittsburgh, PA 15264-2166 | Easman Kodak Company<br>P.O. Box 642166<br>Pittsburgh, PA 15264-2166 | Vendor | | 17,700.41 |
| Internal Revenue Service<br>P.O. Box 21126<br>Philadelphia, PA 19114 | Internal Revenue Service<br>P.O. Box 21126<br>Philadelphia, PA 19114 | Withholding Taxes | | 24,057.58 |
| Konica Minolta Business Solutions USA, Inc.<br>10201 Centurion Parkway N. Su<br>Jacksonville, FL 32256 | Konica Minolta Business Solutions USA, Inc.<br>10201 Centurion Parkway N. Su<br>Jacksonville, FL 32256 | One (1) Pro C6500 | Unliquidated | 20,634.00<br><br>(0.00 secured) |

In re   **Yearbook Photography of Mamaroneck, Inc.**        Case No. _____

                             Debtor(s)

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS
### (Continuation Sheet)

| (1)<br><br>Name of creditor and complete mailing address including zip code | (2)<br><br>Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | (3)<br><br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br><br>Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5)<br><br>Amount of claim [if secured, also state value of security] |
|---|---|---|---|---|
| Konica Minolta Business<br>Dept 952823<br>Atlanta, GA 31192-2823 | Konica Minolta Business<br>Dept 952823<br>Atlanta, GA 31192-2823 | Vendor | | 1,174.22 |
| OfficeTeam<br>12400 Collections Center Drive<br>Chicago, IL 60693 | OfficeTeam<br>12400 Collections Center Drive<br>Chicago, IL 60693 | Temporary Employment Agency Payable | | 2,247.05 |
| Paper Mart<br>151 RidgeDale Avenue<br>East Hanover, NJ 07936 | Paper Mart<br>151 RidgeDale Avenue<br>East Hanover, NJ 07936 | Vendor | | 2,158.74 |
| Pitney Bowes Global<br>Financial Services, LLC<br>P.O. Box 85460<br>Lousiville, KY 40285-6460 | Pitney Bowes Global<br>Financial Services, LLC<br>P.O. Box 85460<br>Lousiville, KY 40285-6460 | Lease arrears | | 1,352.93 |
| Pitney Bowes Global<br>Financial Services LLC<br>P.O. Box 85460<br>Louisville, KY 40285-6460 | Pitney Bowes Global<br>Financial Services LLC<br>P.O. Box 85460<br>Louisville, KY 40285-6460 | | Unliquidated | 1,260.00<br><br>(0.00 secured) |
| Professional Graphics<br>Three West Main Street<br>Elmsford, NY 10523 | Professional Graphics<br>Three West Main Street<br>Elmsford, NY 10523 | Vendor | | 621.46 |
| Promark International, Inc.<br>39476 Treasury Center<br>Chicago, IL 60694-9400 | Promark International, Inc.<br>39476 Treasury Center<br>Chicago, IL 60694-9400 | Vendor | | 512.89 |
| Staples Credit Card<br>P.O. Box 9020<br>Des Moines, IA 50368 | Staples Credit Card<br>P.O. Box 9020<br>Des Moines, IA 50368 | Credit Card | | 739.23 |
| Yankee Plak<br>240 Alice Street<br>Bridgeport, CT 06606 | Yankee Plak<br>240 Alice Street<br>Bridgeport, CT 06606 | Vendor | | 954.98 |

## DECLARATION UNDER PENALTY OF PERJURY
## ON BEHALF OF A CORPORATION OR PARTNERSHIP

     I, the Vice President of the corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date   **May 14, 2010**                 Signature   /s/ _____

                                           **Roxanne Davis**
                                           **Vice President**

*Penalty for making a false statement or concealing property:* Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C. §§ 152 and 3571.

## SCHEDULE II

### Five Largest Secured Creditors

JP Morgan Chase Bank                    $2,940,000
c/o Teitelbaum & Baskin, LLP
3 Barker Avenue
White Plains, NY 10601
attn: Jay Teitelbaum, Esq

# SCHEDULE III

## ESTIMATED 30 DAY RECEIPTS AND DISBURSEMENTS

**See Attached.**

# Davis Studio Projection Week-By-Week Thru 7/2/10

5/10/10

|  | Friday 5/14/10 | Friday 5/21/10 | Friday 5/28/10 | Friday 6/4/10 | Friday 6/11/10 | Friday 6/18/10 | Friday 6/25/10 | Friday 7/2/10 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $ 70,000 | $ 165,000 | $ 165,538 | $ 268,049 | $ 273,527 | $ 364,724 | $ 332,262 | $ 411,348 | |
| Est. Cash Receipts | $125,000 | $125,000 | $125,000 | $133,000 | $133,000 | $133,000 | $133,000 | $64,000 | $971,000 |
| TOTAL CASH | $ 195,000 | $ 290,000 | $ 290,538 | $ 401,049 | $ 406,527 | $ 497,724 | $ 465,262 | $ 475,348 | |

| EXPENSES | 5/14/10 | 5/21/10 | 5/28/10 | 6/4/10 | 6/11/10 | 6/18/10 | 6/25/10 | 7/2/10 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|
| Gross Payroll OFFICERS | $0 | $6,462 | $0 | $6,462 | $0 | $6,462 | $0 | $9,693 | $29,079 |
| Gross Payroll OTHERS | $0 | $86,000 | $0 | $84,000 | $0 | $84,000 | $0 | $118,000 | $372,000 |
| U.S. Trustee Fee | $0 | $0 | $3,250 | $0 | $0 | $0 | $3,250 | $0 | $6,500 |
| Employee Exp. | $0 | $10,000 | $0 | $10,000 | $0 | $10,000 | $0 | $6,000 | $36,000 |
| Outside Labor | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $0 | $0 | $6,000 |
| Staten Island Electric | $0 | $0 | $0 | $0 | $450 | $0 | $500 | $0 | $950 |
| Timestone | $0 | $0 | $6,239 | $0 | $0 | $0 | $0 | $0 | $6,239 |
| Repairs & Maint. | $0 | $0 | $1,000 | $0 | $0 | $0 | $1,000 | $0 | $2,000 |
| Telephones | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,000 | $3,000 |
| Health Insur. | $0 | $0 | $0 | $15,000 | $0 | $0 | $0 | $0 | $15,000 |
| Sales Tax | $0 | $14,000 | $1,000 | $0 | $0 | $24,000 | $2,000 | $20,000 | $61,000 |
| Professional Fees | $0 | $0 | $0 | $1,060 | $0 | $0 | $1,850 | $1,060 | $3,970 |
| Bank Payments | $27,000 | $7,000 | $0 | $0 | $27,000 | $0 | $7,000 | $0 | $68,000 |
| Lease Payments | $0 | $0 | $0 | $0 | $1,353 | $0 | $3,814 | $0 | $5,167 |
| Purchases | $0 | $0 | $2,000 | $10,000 | $10,000 | $40,000 | $30,000 | $0 | $92,000 |
| Office Expenses | $0 | $0 | $500 | $0 | $0 | $0 | $0 | $0 | $500 |
| Ins. Premiums | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Mailing | $2,000 | $0 | $7,500 | $0 | $2,000 | $0 | $4,500 | $0 | $16,000 |
| TOTAL EXPENSES | $30,000 | $124,462 | $22,489 | $127,522 | $41,803 | $165,462 | $53,914 | $157,753 | $723,405 |
| Cash Available | $ 165,000 | $ 165,538 | $ 268,049 | $ 273,527 | $ 364,724 | $ 332,262 | $ 411,348 | $ 317,595 | |

* As per my discussion with Chuck on Friday, 5/7/10, there will be an ACH debit on Monday, 5/10/10 in the amount of $1,700.05 for the employees money in the 401(k). On Wednesday, 5/12/10 there will be an ACH debit for Fed. & State payroll taxes in the amount of $25,246.69. Both these numbers were in the budget from last week's gross payroll. He approved both debits.

# SCHEDULE IV

## Asset Purchase Agreement

**See Attached**

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "**Agreement**") is made as of May 17, 2010, by and between HERFF JONES, INC., an Indiana corporation ("**Buyer**") and YEARBOOK PHOTOGRAPHY OF MAMARONECK, INC., D/B/A DAVIS STUDIO ("**Seller**"). Buyer and Seller are sometimes referred to individually in this Agreement as a "**Party**" and collectively as the "**Parties**." Other capitalized terms used in this Agreement and not otherwise defined have the meanings set forth in Article 7.

## RECITALS

A.     Seller is engaged in the business of providing portrait, candid and digital photography services to nursery, elementary, middle and high schools and colleges and universities throughout the New York Metropolitan area (the "**Business**").

B.     On the terms and subject to the conditions set forth in this Agreement, Buyer desires to acquire from Seller and Seller wishes to sell to Buyer, the Purchased Assets (as defined herein) of the Business.

C.     Seller has undertaken to file a voluntary petition for relief in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), commencing a case (the "**Proceeding**") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "**Bankruptcy Code**"), promptly following execution and delivery of this Agreement.

D.     In connection with the Proceeding, Seller will seek approval of the transactions contemplated by this Agreement from the Bankruptcy Court, including the sale of the Purchased Assets pursuant to the terms of this Agreement free and clear of any and all Encumbrances pursuant to Section 363 of the Bankruptcy Code and the assignment and assumption of certain Contracts pursuant to Section 365 of the Bankruptcy Code.

E.     The Purchased Assets (as defined herein) are subject to first priority liens and security interests granted to JPMorgan Chase Bank, N.A. ("**Chase**" or the "**Bank**") pursuant to (I) Credit Agreement dated as of June 7, 2007 between Chase and the Seller (as amended from time to time, including on March 27, 2009 and February 3, 2010) (collectively, the "**Credit Agreement**"); (II) Advised Line of Credit Note dated April 24, 2007, in the original principal amount of $500,000, executed by the Seller for the benefit of Chase (as amended or modified from time to time, including by (a) Advised Line of Credit Note dated January 30, 2008 in the principal amount of $2,000,000.00; (b) Advised Line of Credit Note dated March 6, 2008 in the principal amount of $2,000,000.00; (c) Advised Line of Credit Note dated January 30, 2009 in the principal amount of $2,200,000.00; (d) Note Modification Agreement dated as of March 27, 2009; and (e) Note Modification Agreement dated as of February 3, 2010) (collectively, the "**Advised Line of Credit Note**"); (III) Term Note dated June 7, 2007 in the original principal amount of $1,200,000.00, executed by the Seller in favor of Chase (the "**Term Note**"); (IV) Continuing Security Agreement dated as of April 24, 2007, executed by the Seller for the benefit of Chase and securing the Seller's obligations under the Advised Line of Credit Note and the Term Note (the "**Security Agreement**"); and all other documents executed by or among the

parties in connection with the liabilities of the Seller to Chase (and any and all amendments and modifications to all of the foregoing, are referred to collectively herein as the "**Existing Agreements**"); and pursuant to any order of the Bankruptcy Court granting Chase certain additional liens and claims as adequate protection pursuant to Bankruptcy Code, including Sections 105, 363 and 364 (collectively, the "**Chase Encumbrances**").

F.     Chase has consented to a sale of the Purchased Assets, as defined herein, pursuant to an order of the Bankruptcy Court, provided that the Seller and Chase obtain an order acceptable to Chase concerning the Buyer's use of cash collateral for a period not beyond July 2, 2010; and provided that the Closing Payment paid to Chase from the sale contemplated herein for the Purchased Assets is not less than $500,000 (subject only to reduction for the Carve Out, as defined in the Cash Collateral Order).

G.     The Parties desire to consummate the transactions contemplated by this Agreement as soon as reasonably practicable.

Therefore, in consideration of the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## Article 1.     PRINCIPAL TRANSACTION

Section 1.1 **Purchase and Sale of the Purchased Assets**.  Upon the terms and subject to the conditions set forth in this Agreement, at Closing, for the consideration set forth in Section 1.2, Seller will sell, transfer, assign, convey and deliver to the Buyer and Buyer will purchase, accept and acquire from the Seller, all of Seller's right, title and interest in, to and under the Purchased Assets, free and clear of any and all Encumbrances.

Section 1.2 **Consideration.**

(a)     In consideration of the sale, transfer, assignment, conveyance and delivery of the Purchased Assets, the Buyer will pay $500,000.00 by wire transfer of immediately available funds to Seller's bankruptcy estate at Closing (the "**Closing Payment**").

(b)     As additional consideration for the Purchased Assets, at Closing the Buyer will assume the following liabilities and obligations of Seller (the "**Assumed Obligations**"):

(1)     obligations under the Assumed Contracts first arising after the Closing;

(2)     legal payment obligations to customers of Seller for rebates or commissions in respect of goods or services delivered by Seller prior to the Closing incurred in the ordinary course of business and in accordance with Seller's standard practices as may be assumed by Buyer in its sole discretion (the "**Assumed Customer Rebates**");

2

(3)     obligations not to exceed $72,000 incurred and accrued prior to Closing with respect to those employees of Seller which are hired by Buyer on the Closing Date (the "**Accrued Employee Obligations**").

(c)     Except for the Assumed Obligations, Buyer will not assume or in any way become responsible for any Liability of Seller or any Affiliate of Seller (the Liabilities not expressly assumed by as part of the Assumed Obligations are collectively referred to in this Agreement as the "**Excluded Liabilities**"). The assumption by Buyer of an Assumed Obligation will not limit any claims or defenses that Buyer may have against any Person other than Seller.

(d)     To the extent Buyer (in its sole and absolute discretion) discharges any of the Assumed Customer Rebates prior to Closing (the "**Pre-Closing Payments**"), Seller shall promptly notify Seller in writing of the date, amount and payee of any such Pre-Closing Payments. The sale procedures approved by the Court shall require that any successful topping bid in the Auction must be increased by an amount equal to the Pre-Closing Payments and that the Pre-Closing Payments shall be repaid to Buyer in full in cash at the closing of the sale of any Purchased Assets to such successful bidder. In no event, however, shall the Closing Payment be offset for any such payments or claims made by Buyer.

**Article 2.     CLOSING; CONDITIONS TO CLOSING; DELIVERIES**

Section 2.1 **Time and Place**. The consummation of the transactions contemplated by this Agreement will take place at a closing (the "**Closing**") to be held at the offices of Barnes & Thornburg LLP, 11 South Meridian Street, Indianapolis, Indiana 46204, or at another location mutually agreed to by the Parties, on the third Business Day (or such later date designated by Buyer in its sole discretion not later than the 12th day) after the date of entry of the Approval Order and the satisfaction or waiver of all other conditions to Closing set forth in Sections 2.2 and 2.3, unless such date is extended by agreement of the Parties with the consent of the Bank (the "**Closing Date**").

Section 2.2 **Conditions Precedent to the Obligations of Buyer**. The obligations of Buyer to consummate the transactions contemplated by this Agreement are expressly subject to the fulfillment of each of the following conditions, any of which (other than the condition set forth in Section 2.2(b)) may be waived, in whole or in part, by Buyer at or before the Closing in its sole discretion:

(a)     Each of the representations and warranties of Seller contained in this Agreement must be true and correct on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date; and Seller must have performed and complied with its agreements, covenants and other obligations contained in this Agreement that are required to be performed or complied with at or before Closing;

(b)     Seller shall have duly and timely file the Petition commencing the Bankruptcy Proceeding no later than May 19, 2010; and the Approval Order must have

been entered on the docket by the clerk of the Bankruptcy Court by no later than June 25, 2010;

(c)     There must not have been any loss or destruction of any property, assets or rights that would have constituted Purchased Assets, whether or not covered by Insurance; and no customers of the Seller who are party to any Assumed Contract shall have engaged, or informed Seller or Buyer that it intends to engage a business other than Seller or Buyer to provide the goods or services called for under its Assumed Contract ("Terminating Customers"), other than Terminating Customers whose business with Seller during 2009, when aggregated with such 2009 business of all Terminating Customers, does not exceed in the aggregate 15% of Seller's 2009 revenues.

(d)     Seller must have delivered or caused to be delivered to Buyer each of the documents required under Section 2.4;

(e)     There must be no temporary restraining order, preliminary injunction, permanent injunction, stay pending appeal of the Approval Order under Rule 8005 or similar provision, or other Order issued by a Governmental Body, and no Legal Requirement in effect, preventing the consummation of the transactions contemplated by this Agreement.

(f)     The Bank shall have consented to the terms of use of the Bank's cash collateral, the bidding procedures, sale orders applicable to the Purchased Assets, and the consideration to be paid for the Purchased Assets free and clear of the Chase Encumbrances, all on terms substantially consistent with the terms of this Agreement.

Section 2.3 **Conditions Precedent to the Obligations of Seller**. The obligations of Seller to consummate the transactions contemplated by this Agreement are expressly subject to the fulfillment of each of the following conditions, any of which (other than the condition set forth in Section 2.3(b)), may be waived, in whole or in part, by Seller at or before the Closing in its sole discretion:

(a)     Each of the representations and warranties of Buyer contained in this Agreement must be true and correct and as of the Closing Date with the same force and effect as though made on and as of the Closing Date; and Buyer must have performed and complied with its agreements, covenants and other obligations contained in this Agreement that are required to be performed or complied with at or before the Closing;

(b)     The Bank shall have consented to the terms of use of the Bank's cash collateral, the bidding procedures, sale orders applicable to the Purchased Assets, and the considerations to be paid for the Purchased Assets free and clear of the Chase Encumbrances, all on terms substantially consistent with the terms of this Agreement.

(c)     the Approval Order must have been entered on the docket by the clerk of the Bankruptcy Court; and

(d)     Buyer must have delivered or caused to be delivered each of the deliveries required under Section 2.5.

Section 2.4 **Closing Deliveries of Seller**.  At the Closing, Seller will deliver or cause to be delivered to Buyer the following documents:

(a)     a Bill of Sale, in a form to reasonably acceptable to Buyer, conveying the Purchased Assets free and clear of all Encumbrances, duly executed by Seller (the "Bill of Sale");

(b)     an Assignment and Assumption Agreement evidencing assignment to Buyer of the Assumed Contracts and Buyer's assumption of the Assumed Obligations, in a form reasonably acceptable to Buyer, duly executed by Seller (the "**Assumption Agreement**");

(c)     a duly executed Employment and Non-Competition Agreement between Greg Davis and Buyer, in the form attached hereto as <u>Exhibit A</u> (the "**Greg Davis Employment Agreement**"); a duly executed Employment and Non-Competition Agreement between Roxanne Davis and Buyer, in the form attached hereto as <u>Exhibit B</u> (the "**Roxanne Davis Employment Agreement**"); and sales representation or employment and non-competition  agreements with each of Seller's employees named on <u>Exhibit C</u>, either (as Buyer may elect) in the form customarily utilized by Buyer in its photography division, or in substantially the form of (and no less favorable to the employer than) the agreements addressing terms of employment, protection of confidential information, non-competition and similar matters to which such listed employees are currently party with Seller;

(d)     the complete Customer List in paper and electronic format as Buyer may reasonably request;

(e)     the Customer Images (all copies of any images in physical format—whether paper, negatives, film or other medium shall be physically delivered to Buyer; and all images in digital or electronic form of any nature shall be delivered to Buyer in such electronic format (appropriately coded or organized based on customer order, contract and/or identity) as Buyer reasonably requests as necessary to readily permit transfer of such data to Buyer's systems);

(f)     a certified copy of the Approval Order, which shall contain language necessary to release the Purchased Assets from all Encumbrances and determining Buyer to be a good faith purchaser;

(g)     copies of the resolutions adopted by the Board of Directors and shareholders of Seller evidencing their authorization of the execution and delivery of this Agreement and each of the Transaction Documents to which such Seller is a party, and the consummation of the transactions contemplated hereby and thereby, along with a certification of the copies of the Seller's Organizational Documents as true and correct copies thereof each as amended and in effect as of the Closing Date, all certified by an authorized officer of Seller;

(h)     a certificate by an authorized officer of Seller certifying the satisfaction of the condition set forth in Section 2.2(a);

(i)      such other documents as may be reasonably requested by Buyer to vest in Buyer title in and to the Purchased Assets and to effect and confirm such other actions as are contemplated in this Agreement or the other Transaction Documents.

Section 2.5 **Closing Deliveries of Buyer**.  At the Closing, Buyer will pay the Closing Payment as provided in Section 1.2(a) and deliver the following documents:

(a)      the Assumption Agreement, duly executed by the Buyer;

(b)      such other documents as may be reasonably requested by Seller for the assumption of the Assumed Obligations by Buyer and to effect and confirm such other actions as are contemplated in this Agreement or the other Transaction Documents.

## Article 3.     REPRESENTATIONS AND WARRANTIES OF SELLER

Seller makes the following representations and warranties as of the date of this Agreement to induce Buyer to enter into this Agreement and again on the Closing Date to induce Buyer to consummate the transactions contemplated hereby:

Section 3.1 **Organization**.  Seller is a corporation duly organized, validly existing and in good standing under the Legal Requirements of the State of New York.  Subject to any necessary authorization from the Bankruptcy Court, Seller has the requisite corporate power and authority to conduct the Business as now being conducted, to own and use the Purchased Assets and to perform its obligations under the Assumed Contracts to which it is a party.

Section 3.2 **Financial Statements and Financial Matters**.  Copies of the balance sheets and statements of income of the Business at and for the fiscal year ended December 31, 2009 (the "**Financial Statements**") and at and for the four month period ended April 30, 2010 (the "**Interim Financial Statements**") have been delivered to Buyer.  The Financial Statements and Interim Financial Statements (subject, in the case of the Interim Financial Statements, to normal year-end adjustments and the absence of footnotes which, if presented, would not differ materially from those included in the Financial Statements) are complete and accurate in all material respects and present fairly the financial condition of the Business at the dates indicated and its results of operations for the periods then ended; provided that adjustments, if any, that would be required to be made to any such financial statements to reflect Seller's assets and operations other than on a "going concern" basis havenot been made or reflected.

Section 3.3 **Taxes**.  All Taxes required to have been collected or withheld by Seller with respect to the Business have been timely collected or withheld and, to the extent required by Legal Requirement, timely paid to the proper Governmental Body.

Section 3.4 **Customers**.  Seller has delivered to Buyer a true and accurate list of the Seller's customers (meaning, where applicable, the schools or organizations authorizing Seller to photograph their students, members or events, as distinct from the names of such students, members or relatives who may have purchased photos or other goods or services directly) by dollar volume of sales or purchases for the twelve months ended December 31, 2009, showing the approximate total sales for each customer.

Section 3.5 **Employee Benefit Plans**.  Seller has timely complied with applicable obligations under, and Legal Requirements relating to, the Employee Benefit Plans (including, to the extent applicable, reporting, disclosure, prohibited transaction, IRS qualification, Section 409A of the Code, ERISA and funding obligations).

Section 3.6 **Employee Contracts.**  Seller has provided to Buyer true and complete copies of each current employment agreement, sales representation agreement, confidentiality or non-competition agreement and/or agreement regarding assignment of works to which it is a party with any of its employees or sales representatives.  No employee of Seller has any employment or similar agreement with Seller, whether written or oral, that has not been provided to Buyer. All of Seller's sales representatives are employees of the Seller and not independent contractors.

Section 3.7 **Other Properties and Assets**.

(a)     All of the Purchased Assets are free and clear of any and all Encumbrances, except for the Chase Encumbrances.  Upon consummation of the Closing, all of the Purchased Assets will be transferred to Buyer free and clear of any and all Encumbrances.  None of the Purchased Assets is subject to any Encumbrance that would affect its valid transfer to Buyer at Closing.

(b)     Seller owns each of the Customer Images and owns exclusively all copyright in each of the Customer Images.  Seller owns the the Customer List exclusively has protected the information comprising the Customer List as proprietary and confidential and has not disclosed any substantial portion of such information to any person not bound by a fiduciary obligation (as in the case of employees acting in the course of their employment) or covenant (in the case of third parties such as Buyer) to maintain such information in confidence.  On and following the Closing Date, the Buyer will have the right to continue to use exclusively all Intellectual Property Assets of Seller that comprise any part of the Purchased Assets (the "**Purchased Intellectual Property Assets**")..

Section 3.8 **Litigation**.  Other than the Proceeding, there is no Action or Order pending with respect to the Business or any of the Purchased Assets.  To Seller's Knowledge no such Action or Order has been Threatened.   To Seller's Knowledge no event has occurred or circumstance exists that could reasonably be expected to give rise to or serve as a basis for any material Action or Order.

Section 3.9 **Authorization and Enforceability; No Conflict**.  Subject to any necessary authorization from the Bankruptcy Court and consent of the Bank, Seller has the requisite power and authority to enter into and perform the Transaction Documents to which it is a party and to carry out the transactions contemplated by the Transaction Documents to which it is a party.  The execution, delivery and performance by Seller of each Transaction Document to which it is a party (or will at Closing become a party) has been duly authorized, approved and adopted. Subject to any necessary authorization from the Bankruptcy Court and consent of the Bank, each Transaction Document to which Seller is a party is (or upon execution and delivery will be) binding upon Seller and is (or upon execution and delivery will be) enforceable against Seller in accordance with its terms.  Assuming the receipt of the Approval Order prior to Closing, the

execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby will not (i) contravene any Organizational Documents of Seller or result in a Breach of any provision of, or constitute a default under, any Assumed Contract; (ii) violate any Legal Requirement or Order or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate or modify any Governmental Authorization with respect to the Business; (iii) result in the acceleration of any Assumed Obligation or adversely modify the terms of any Assumed Obligation; (iv) result in any Encumbrance being created or imposed upon Buyer or any Purchased Asset; or (v) require any authorization, consent, approval, exemption or other authority or notice to any Governmental Body.

Section 3.10 **Consents.** Other than approval of the Bankruptcy Court, no consents, approvals or authorizations of any Person are required (including those that might be required under the terms of any Assumed Contract to avoid a Breach or default upon assignment thereof) in connection with the execution, delivery and performance of any Transaction Document or the consummation of the transactions contemplated thereby.

Section 3.11 **Assumed Contracts.** Each Assumed Contract is in full force and effect and is valid and enforceable in accordance with its terms. The Seller, and to Seller's Knowledge each other Person that is a party to an Assumed Contract, has complied and is complying with the terms of the Assumed Contract, and to Seller's Knowledge no event has occurred or circumstance exists that (with or without notice or lapse of time) may contravene, conflict with or result in a violation or Breach of or default under any Assumed Contract, other than a failure by Seller (if any) to timely remit standard customer rebates or commissions to customers. Other than payment of Assumed Customer Rebates, no payment to any Person is required under any Assumed Contract to cure any default. A copy of each Assumed Contract has been provided to Buyer; provided that, to the extent any Assumed Contract is an oral agreement or is not in an integral written form or is comprised by order forms or in one or more other Records of Seller, a true and complete listing describing each such Assumed Contract in reasonable detail has been provided to Buyer.

Section 3.12 **Permits and Licenses; Compliance with Legal Requirements**. Each Governmental Authorization required or maintained to carry on the Business as now conducted has been timely obtained, is in full force and effect and has been complied with. With respect to the Business, Seller is now, and during all applicable statute of limitation periods has been, in compliance with applicable Legal Requirements.

Section 3.13 **No Broker's Fees**. Neither Seller nor anyone acting on its behalf has incurred or will incur any Liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement or any other Transaction Document for which Buyer could become liable.

Section 3.14 **Deliveries**. Seller has delivered to Buyer true, correct and complete copies of each document required or indicated in this Agreement as having been provided to Buyer.

**Article 4.      REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer makes the following representations and warranties as of the date of this Agreement to induce Seller to enter into this Agreement and again on the Closing Date to induce Seller to consummate the transactions contemplated hereby:

Section 4.1 **Organization and Good Standing**.  Buyer is a corporation duly organized and validly existing under the applicable Legal Requirements of the State of Indiana, with the requisite corporate power and authority to conduct its business as it is now being conducted and to own and use its properties and assets.

Section 4.2 **Authorization and Enforceability; No Conflict**.  Buyer has the requisite corporate power and authority to enter into and perform the Transaction Documents to which it is a party and to carry out the transactions contemplated by such Transaction Documents.  The execution, delivery and performance by Buyer of each Transaction Document to which it is a party has been duly authorized, approved and adopted by Buyer.  Each Transaction Document to which Buyer is a party is binding upon Buyer and is enforceable against Buyer in accordance with its terms.  The execution, delivery and performance by Buyer of the Transaction Documents to which it is a party and the consummation by Buyer of the transactions contemplated thereby will not (i) contravene any Organizational Document of Buyer or result in a Breach of any provision of, or constitute a default under, any Contract to which Buyer is a party or by which its assets are bound or (ii) violate any Legal Requirement or Order.

Section 4.3 **Availability of Funds**.  Buyer has sufficient funds to enable it to pay the Closing Payment in full when due in accordance with this Agreement.

Section 4.4 **No Broker's Fees**.  Neither Buyer nor anyone acting on its behalf has incurred or will incur any Liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement or any other Transaction Document for which Seller could become liable.

Section 4.5 **No Reliance**.  Buyer has not relied upon any representation or warranty of the Bank.  Buyer acknowledges that the Closing Payment shall be irrevocably paid to the Bank in consideration of the release of the Chase Encumbrances on the Purchased Assets and Buyer shall have no right of offset, counterclaim, or other reduction or recovery of the Closing Payment from Chase for any reason whatsoever.

Section 4.6 **Payment to Chase**. Buyer acknowledges that the entire Closing Payment shall be delivered to the Seller for delivery to Chase (subject to the Carve Out in the Cash Collateral Order) in consideration for the release of the Chase Encumbrances on the Purchased Assets.

**Article 5.      COVENANTS AND AGREEMENTS**

The Parties (as applicable) covenant and agree as follows:

Section 5.1 **Consents and Approvals**.  Seller will, at its sole cost and expense, use reasonable best efforts to (i) obtain all necessary consents and approvals to consummate the

purchase and sale of the Purchased Assets and the assignment of the Assumed Obligations to Buyer, together with any other necessary consents and approvals to consummate the transactions contemplated by the Transaction Documents, including obtaining the Approval Order and consent of the Bank, and (ii) make all filings, applications, statements and reports to a Governmental Body (including, without limitation, the Bankruptcy Court) that are required to be made prior to the Closing Date by or on behalf of Seller pursuant to applicable Legal Requirements.

Section 5.2 **Access to Information and Facilities**. Prior to the Closing Date, Buyer and its Representatives, upon reasonable notice and so long as such access does not unreasonably interfere with the business operations of the Business, will be given access to the books and Records relating to the Purchased Assets, properties and assets and employees of the Business and will be entitled to make such reasonable investigation of the Business as it reasonably determines. Seller will promptly provide to Buyer copies of requested Records relating to the Purchased Assets. No investigation undertaken by Buyer will affect any representations or warranties of Seller made in this Agreement or the conditions to the obligations of the respective Parties to consummate the transactions contemplated by this Agreement.

Section 5.3 **Conduct of the Business Pending Closing**. Except as otherwise expressly contemplated by this Agreement or with the prior written consent of Buyer, from the date of this Agreement until the Closing Date, Seller will (i) use commercially reasonable efforts to keep available the services of its current employees and agents and to maintain its relations and goodwill with its customers (provided that Seller need not pay Assumed Customer Rebates) and (ii) not take any action inconsistent with this Agreement or with the consummation of the transactions contemplated by the Transaction Documents. Until the Closing, or the earlier termination of the this Agreement as permitted under Section 6, without the consent of the Buyer or unless authorized in an Order of the Bankruptcy Court, the Seller shall not sell, transfer or assign any of the Purchased Assets, other than sales of copies of Customer Images to customers in the ordinary course of business. As reasonably requested by Buyer, Seller shall communicate with its customers, and facilitate Buyer's communication with Seller's customers, to explain the existence and conditions to, and anticipated timing of, consummation of this Agreement, and that Buyer (or another party deemed by the Bankruptcy Court to be a suitable and able purchaser) will assume and fully perform the Assumed Contracts with such customers following the Closing.

Section 5.4 **Best Efforts; Further Assurances**. Seller will obtain the entry of the Approval Order on the Bankruptcy Court's docket as soon as practicable and no later than June 25, 2010. Seller will execute such documents and use its reasonable best efforts to take or cause to be taken all actions and do or cause to be done all things necessary, proper or advisable to timely consummate the transactions contemplated by the Transaction Documents (including to put Buyer in actual possession and operating control of the Purchased Assets, to effectuate, record or perfect the transfer of the Purchased Assets to Buyer, free and clear of any and all Encumbrances, to confirm the title of the Purchased Assets in Buyer, to assist Buyer in exercising rights relating thereto, to obtain all consents, approvals and authorizations of Third Parties and to make all filings with and give all notices to Third Parties which may be necessary or required in order to effectuate the transactions contemplated by the Transaction Documents).

Section 5.5 **Bankruptcy Actions.**

(a)     Seller shall promptly file its petition under Chapter 11 of the U.S. Bankruptcy Code in the US Bankruptcy Court for the Southern District of New York. Seller shall immediately thereafter file a motion for approval of a consensual stipulation and order authorizing use of cash collateral, and for consensual bidding procedures and sale order with the consent of the Bank and substantially consistent with the terms of this Agreement. Among other creditors and interested parties, Seller shall ensure that all taxing authorities, Buyer and all parties to the Assumed Contracts are included on its matrix of interested persons and receive notice of all motions and applications in the Proceeding. Seller shall file with the Bankruptcy Court a motion seeking issuance of the Bidding Procedures Order and the Approval Order as soon as practicable after execution of this Agreement and obtain issuance of the Bidding Procedures Order as promptly as practicable thereafter.

(b)     Immediately upon request of Buyer, Seller will file on the docket of the Bankruptcy Court a notice of the Assumed Contracts, which will be identified by the date of the Assumed Contract (if available), the other party to the Contract and the address of such party. Such notice will set forth the amounts as determined by Buyer necessary to cure defaults under each of such Assumed Contracts based on the Books and Records. Seller will, at the written direction of Buyer delivered at any time prior to the Sale Hearing, remove Assumed Contracts from the notice. The notice of the Assumed Contracts will reflect that Buyer's promise to pay any cure amounts and perform from and after the Closing under the Assumed Contracts will be the only adequate assurance of future performance necessary to satisfy the requirements of Section 365 of the Bankruptcy Code in respect of the assignment to Buyer of such Assumed Contracts.

(c)     All motions, applications and supporting papers prepared by Seller and relating (directly or indirectly) in Buyer's good faith determination to the transactions contemplated by this Agreement (including forms of orders, notices to interested parties, and any "settlement motions") must be reasonably acceptable in form and substance to Buyer in its sole discretion and are understood to be subject to the consent of the Bank.

Section 5.6 **Other Bids.**   Upon execution of this Agreement and until the Bidding Procedures Order is entered, Seller will not, and will not allow its respective Representatives to, directly or indirectly, solicit or encourage bids ("**Bids**") from other prospective purchasers (collectively, "**Bidders**") for the sale of the Purchased Assets, or otherwise engage in any negotiations concerning the terms of an agreement for the sale of the Purchased Assets.

Section 5.7 **No Solicitation of Purchase or Sale.**   Seller agrees that during the period from the conclusion of the Auction through the earlier to occur of (a) the Closing Date or (b) the date on which this Agreement is terminated in accordance with the provisions of Section 6.1, Seller will not, directly or indirectly (i) solicit, initiate, assist or accept any offer, inquiry or proposal for, entertain any offer, inquiry or proposal to enter into, take any other action designed to facilitate or encourage (including by way of furnishing any information), any inquiries or the making of any proposal, in any case, in connection with an Acquisition Proposal, (ii) provide any information to any other Person regarding Seller, the Purchased Assets, the Business or an

11

Acquisition Proposal or permit any other Person to conduct a due diligence review of Seller, the Purchased Assets or the Business, (iii) initiate, participate in, continue or conduct any discussions or negotiations regarding any Acquisition Proposal, or (iv) enter into any Contract with respect to any Acquisition Proposal.

Section 5.8 **Employees**. Prior to Closing, Seller shall not terminate (without cause) the employment or services of any employee or sales representative without Buyer's express written consent. At Closing, Seller will terminate those employees of the Business who Buyer has identified in writing to Seller prior to Closing as an employee Buyer intends to hire. Seller will comply with the WARN Act and all comparable state and local Legal Requirements with respect to any termination of employment arising from or in connection with the transactions contemplated by this Agreement. Buyer is not assuming any liabilities or obligations of Seller under any Employee Benefit Plans. The Parties agree that Buyer is not intended to be and is not a successor employer to Seller for any purpose whatsoever including with respect to the Comprehensive Omnibus Budget Reconciliation Act of 1985, as set forth in Section 4980B of the Code (and any predecessor or successor provisions ("**COBRA**"), and that no benefit plan sponsored or maintained by Buyer is intended to be and no such plan will be a successor plan to any Employee Benefit Plan ever maintained or administered by Seller.

Section 5.9 **Allocation at Purchase Price**. The Purchase Price will be allocated among the Purchased Assets in accordance with Section 1060 of the Code and in the manner set forth on Schedule 5.10 attached hereto (the "**Allocation**"). After Closing, the Parties will make consistent use of the Allocation for all Tax purposes and in all filings, declarations and reports with the IRS and other applicable Governmental Bodies in respect thereof. The Parties, as applicable, will each file an IRS Form 8594 "Asset Acquisition Statement Under Section 1060" at the time and in the manner as required by Treasury Regulation 1.1060-T consistent with the Allocation, and the Parties agree not to take any position inconsistent therewith for any Tax purpose.

Section 5.10 **Post-Closing Assignment of Contracts**. Seller will provide Buyer with reasonable advance notice, not less than seven days, of any motion to reject any Contract with ant customer, employee or sales representative and a reasonable opportunity to assume such Contract. Notwithstanding anything in this Agreement to the contrary, on the date any such Contract is assumed and assigned to Buyer pursuant to this Section, such Contract will be deemed an Assumed Contract and deemed to be listed on Schedule 1.2(b)(ii) under the appropriate heading for all purposes under this Agreement.

Section 5.11 **Confidentiality**. Following the Closing, for a period of 5 years, Seller shall take reasonable measures to preserve in confidence for the benefit of Buyer all confidential or proprietary information included in the Purchased Assets (including, without limitation, the content of the Customer List), and shall not use such information other than as reasonably required in connection with the wind down and liquidation of its affairs, or and shall not disclose any of such information except as required by law (including any Order of the Bankruptcy Court).

Section 5.12 **Release of Employees**. Seller acknowledges that Buyer intends to hire employees of the Seller to assist Buyer in servicing the photography needs of Seller's customers

following the Closing. Effective upon the Closing, Seller does hereby waive, for the benefit of Buyer, its rights to require (whether under any contract or common law) any of Greg Davis, Roxanne Davis and/or any employee of Seller named on <u>Exhibit C</u> who is hired by Buyer to refrain from competing with Seller, to refrain from soliciting or serving the needs of any customer of the Business; and all of such persons are hereby fully and unconditionally released as of the Closing from any obligation to Seller that might impair their right and ability to fully assist Buyer in serving the photography and other needs of Seller's customers, including those named on the Customer List.

Section 5.13 **Records.** For a period of five years following Closing, Seller shall preserve its Records relating to its customers and employees hired by Buyer and, upon reasonable notice, afford representatives of Buyer reasonable access to such Records for any purpose in connection with its ongoing dealings with such Persons; provided, that if Seller elects to destroy such Records prior to the end of such period, it shall provide at least 60 days' advance notice to Buyer and afford Buyer the opportunity to take custody, or make copies at its expense, of any of such Records. For 90 days following Closing, Seller shall daily forward to Buyer correspondence and communications or payments (other than payments of accounts receivable that are Excluded Assets) received from customers that relate to such customers' business with Buyer under the Assumed Contracts or otherwise.

Section 5.14 **Seller Deletion of Images.** After the Closing, Seller shall not transfer, transmit, or deliver any of the Customer Images to any Person or any copies thereof, and shall not purport to sell, assign or release any of the Customer Images or any rights therein. After the date 60 days, and not later than the date 90 days, following Closing, Seller shall permanently destroy or delete all copies of any of the Customer Images that it retains in its custody, whether in physical or electronic form.

Section 5.15 **Survival.** All representations and warranties provided by the Parties pursuant to this Agreement will expire at Closing. The covenants set forth in this Agreement shall expire in accordance with their terms.

**Article 6.** TERMINATION

Section 6.1 **Termination.** This Agreement and the transactions contemplated hereby may be terminated and abandoned:

(a) by either Buyer or Seller at any time prior to the Closing with the mutual written consent of the other;

(b) unless the Closing has not occurred as a result of a Breach of this Agreement by the Party seeking such termination (or such Party's Affiliates), by either Buyer or Seller, if the Closing has not occurred by June 28, 2010 (the "**Termination Date**");

(c) by Seller (provided that Seller is not in Breach of any of the representations, warranties, covenants or other agreements contained herein), if Buyer has Breached, in any material respect, any representation, warranty, covenant or other

agreement set forth in this Agreement and such Breach is incapable of being cured or is not cured within five Business Days of receipt of written notice thereof from Seller;

(d)  by Buyer (provided that Buyer is not in Breach of any of the representations, warranties, covenants or other agreements contained herein), if Seller has Breached, in any material respect, any representation, warranty, covenant or other agreement set forth in this Agreement and such Breach is incapable of being cured or is not cured within five Business Days of receipt of written notice thereof from Buyer;

(e)  by either Buyer or Seller, if the Bankruptcy Court has issued an Order approving the sale of any Purchased Assets to a Person other than Buyer or its Affiliate; or

(f)  by Buyer, if the Proceeding is converted into a case under Chapter 7 of the Bankruptcy Code, a trustee or examiner with expanded powers is appointed pursuant to the Bankruptcy Code or the Bankruptcy Court enters an order pursuant to Section 362 of the Bankruptcy Code modifying or lifting the automatic stay with respect to any properties or assets intended to be Purchased Assets.

Section 6.2 **Effect of Termination**.  If this Agreement is terminated pursuant to Section 6.1, this Agreement will become null and void and none of the Parties will have any further obligation hereunder, except as set forth in Article 6, Article 7, and Article 8 which Articles survive any termination and will remain in full force and effect.

**Article 7.**  DEFINITIONS

For purposes of this Agreement, the following terms have the meanings specified in this Article 7.

"**Acquisition Proposal**" means a proposal other than by Buyer or its Affiliates relating to a merger, consolidation, business combination involving Seller, sale or other disposition of 10% or more of the Purchased Assets pursuant to one or more transactions, the sale of 10% or more of the outstanding shares of capital stock or equity interests of Seller (including by way of tender offer, foreclosure, plan of reorganization or liquidation) or a similar transaction or business combination involving one or more Third Parties and Seller.  For the avoidance of doubt, a proposal solely with respect to Excluded Assets or any portion thereof will not be included in the definition of "Acquisition Proposal."

"**Action**" means any proceeding, action, arbitration, written charge, written claim, written complaint, challenge, dispute, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

"**Affiliate**" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.

**"Approval Order"** means the final, non-appealable Order of the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code approving the transactions contemplated by this Agreement.

**"Assumed Contracts"** means all outstanding Contracts of Seller entered into or acquired in the ordinary course of Business with any customer of Seller (including any school or other sponsoring organization, as well as any direct purchaser of products or services), including, without limitation, those listed or described on <u>Schedule 1.2(b)</u>.

**"Auction"** means the auction conducted by Seller in the Proceeding for substantially all of the Purchased Assets.

**"Bidding Procedures Order"** means an Order of the Bankruptcy Court in the Proceeding approving bidding procedures for the Auction, a break-up fee of $35,000 (plus an amount equal to all Pre-closing Payments in respect of customer rebates or obligations), and related notices and scheduling a hearing to approve the sale of the Purchased Assets.

**"Breach"** means, as to any representation, warranty, covenant, agreement, obligation or other provision of this Agreement or any other Transaction Document, any inaccuracy in, or any failure to perform or comply with, such representation, warranty, covenant, agreement, obligation or other provision.

**"Business Day"** means any day excluding Saturday, Sunday and any day that is a legal holiday within the meaning of Rule 9006(a) of the Federal Rules of Bankruptcy Procedure.

**"Claim"** will have the meaning set forth in Section 101(5) of the Bankruptcy Code.

**"Code"** means the United States Internal Revenue Code of 1986, as amended, and any duly promulgated regulations and rulings thereunder.

**"Contract"** means any agreement, contract, obligation, promise, arrangement, understanding or undertaking, as well as any purchase order, and any scheduled event or appointment for the provision, or request by any Customer for the provision or scheduling, of photographic services (in any such case, whether written or oral and whether express or implied, and whether or not legally binding).

**"Customer List"** means a listing as of the Closing Date of all customers of the Seller who are schools or similar sponsoring organizations that scheduled or engaged the services of Seller to provide photography services in respect of their students, members, event or otherwise, to or for which Seller has provided goods or services since January 1, 2008, or with which Seller has a Contract or order to provide any goods or services, such listing to include the name, address, e-mail address, and phone number of each customer, the name and title or position of the Seller's primary contact (and secondary contact, if any) at such customer, the total sales to or in respect of such customer in 2009 and 2010 year-to-date, respectively, and identification of the Seller's sales representative or employee of Seller who serves as the primary sales and service contact to such customer.

**"Employee Benefit Plan"** means any "employee pension benefit plan" or "employee welfare benefit plan" as defined under ERISA (whether or not subject to ERISA), and any incentive compensation plan, benefit plan for retired employees, plan or Contract providing for payments subject to Section 409A of the Code, bonuses, commissions, pensions, profit-sharing, stock options, stock purchase rights, restricted stock, phantom stock, deferred compensation, Insurance relating to accidents, health or sickness, retirement benefits, vacation, severance, disability, compensation, employee assistance or counseling, educational assistance, §125/cafeteria/flexible benefits, adoption assistance, group legal, (taxable or nontaxable, direct or indirect), fringe or payroll practice of any nature, covering any current or former (including retired) employees of the Business under which Seller has any remaining liability or obligation.

**"Encumbrances"** means any lien, charge, claim (as defined in Section 101(5) of the U.S. Bankruptcy Code), pledge, conditional sale agreement or other title retention agreement, lease, mortgage, deed of trust, right of first refusal, security interest, option, proxy, voting trust or agreement, transfer restriction or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction); and such term includes, without limitation, the Chase Encumbrances.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, and any duly promulgated regulations and rulings thereunder.

**"Excluded Assets"** means assets of the Seller other than the Purchased Assets. For avoidance of doubt, the Excluded Assets include, without limitation:

    (a)    Seller's rights under the Transaction Documents;

    (b)    the Closing Payment payable pursuant to Section 1.2(a);

    (c)    inventory;

    (d)    Property, plant and equipment (other than the Server);

    (e)    Cash on hand; and all trade accounts receivable and other contractual rights to payment representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of Seller that are properly accrued and payable on Seller's books and Records on or prior to the Closing Date (regardless whether such payments are received before or after Closing); and

    (f)    all assets of Seller with respect to any of Seller's Employee Benefit Plans.

**"Governmental Authorization"** means any approval, consent, license, permit, registration, accreditation, waiver or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

**"Governmental Body"** means any: (a) nation, state, county, city, town, village, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi-governmental authority of any nature (including any

governmental agency, branch, department, official or entity and any court or other tribunal); (d) multi-national organization or body; (e) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or Taxing authority; (f) organization or association that sponsors, authorizes or conducts any arbitration proceeding, or (g) any arbitrator or panel of arbitrators, the decisions of which are enforceable in any court of law.

"**Insurance**" means all forms of insurance, including liability, crime, fidelity, life, fire, product liability, workers' compensation, health, director and officer liability and other forms of insurance owned, maintained or insuring any part of the Business, the Purchased Assets or the properties, assets or employees of Seller with respect to the Business.

"**Intellectual Property Assets**" include all: (a) U.S. and foreign trademark rights, business identifiers, trade dress, service marks, trade names and brand names, U.S. and foreign registrations and applications therefor and all goodwill associated with the foregoing; (b) U.S. and foreign copyrights, copyright registrations and copyright applications, and all other rights associated with the foregoing and the underlying works of authorship; (c) U.S. and foreign patents and patent applications, and all international proprietary rights associated therewith; (d) inventions, mask works, mask work registrations, know-how, bills of material, discoveries, improvements, designs, trade secrets, shop and royalty rights; (e) employee covenants and Contracts respecting intellectual property, including invention rights, noncompetition and license Contracts; and (f) other types of intellectual property, including software interfaces, corporate names, websites, and links to websites.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge**" means a Party's actual awareness following reasonable inquiry.

"**Legal Requirement**" means any federal, state, local, municipal, foreign, international, multinational or constitution law, ordinance, principle of common law (including equitable principles), statute, code, regulation, rule or treaty.

"**Liability**" means any loss, cost, liability, obligation, penalty, Tax, Claim, damage, expense (including cost of investigation, defense, settlement and reasonable legal and other reasonable professional fees and costs), remedial action or diminution of value, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted.

"**Order**" means any award, decision, injunction, judgment, order, ruling, subpoena or verdict entered, issued, made or rendered by any Governmental Body.

"**Organizational Documents**" means the organizational documents of a non-natural Person, including, as applicable, the charter, articles or certificate of incorporation, bylaws, articles of organization, operating agreement or similar governing documents, as amended.

"**Person**" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, Governmental Body or other entity.

"**Purchased Assets**" means only the following assets, rights, titles and interests owned, licensed or leased by Seller (including indirect and other forms of beneficial ownership) as of the Closing Date, which are used in, useful for or otherwise associated with the Business:

      (a)    all of Seller's rights in and under the Assumed Contracts and Records relating directly thereto evidencing the terms thereof and the status of performance or delivery of services or goods thereunder;

      (b)    all images, photographic or otherwise, whether in electronic, paper or other form, or similar work-in-process, held by Seller in connection with the performance of services or delivery of products in relation to any of the Assumed Contracts, including, without limitation, all ownership rights, including all copyright, in such images (collectively, the "**Customer Images**");

      (c)    the Customer List, the goodwill of the Business associated with the customers identified thereon and rights to do business with such listed Persons, their students, members or other associated individuals;

      (d)    all Intellectual Property Assets related to any of the foregoing, including, without limitation, all rights in the tradename "Davis Studio" and all related goodwill; and

      (e)    the server(s) or other computer equipment specified on Exhibit D, on which the Customer Images are stored as of the Closing (collectively, the "**Server**").

"**Purchase Price**" means the Closing Payment plus the book value of the Assumed Obligations.

"**Record**" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"**Representative**" means, with respect to a particular Person, any director, officer, manager, managing member, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"**Sale Hearing**" means the hearing in Bankruptcy Court to approve this Agreement and the transactions contemplated hereby.

"**Seller's Knowledge**" means the Knowledge of any director or officer of any Seller or Greg Davis or Roxanne Davis.

"**Tax**" or "**Taxes**" means any tax (including any income tax, gross receipts tax, capital gains tax, value-added tax, sales tax, use tax, property tax, business tax, payroll tax, gift tax, estate tax, franchise tax, net worth tax, excise tax and business occupancy tax), levy, assessment,

tariff, duty (including any customs duty), deficiency or other fee or any related charge or amount (including any fine, penalty, interest or addition thereto), imposed, assessed or collected by or under the authority of any Governmental Body or payable pursuant to any tax-sharing Contract or any other Contract relating to the sharing of payment of any tax, levy, assessment, tariff, duty, deficiency or fee.

"**Threatened**" means, as to any Action or other matter, that a demand or statement has been made (orally or in writing), a notice has been given (orally or in writing) or an event has occurred or some other circumstance exists that would lead a prudent Person to conclude that such an Action or other matter is reasonably likely to be asserted, commenced, taken or otherwise pursued in the future.

"**Transaction Documents**" means this Agreement and all other Contracts and documents to be executed and delivered by any Party or any of its Affiliates or Representatives in connection with the consummation of the transactions contemplated by this Agreement.

"**WARN Act**" means the Worker Adjustment and Retraining Notification (**WARN**) Act Pub. L. 100 379.102 stat. 890 (1988), as amended, codified at 29 U.S.C. 2101 *et seq.*

## Article 8. GENERAL

Section 8.1 **Binding Effect; Benefits; Assignment**. All of the terms of this Agreement and the other Transaction Documents executed by a Party will be binding upon, inure to the benefit of and be enforceable by and against the successors and authorized assigns of such Party. Except as otherwise expressly provided in this Agreement or another Transaction Document, nothing in this Agreement or such other Transaction Document, express or implied, is intended to confer upon any other Person any rights or remedies under or by reason of this Agreement or such other Transaction Document, this Agreement and the other Transaction Documents being for the exclusive benefit of the applicable Parties and their successors and assigns. No Party will assign any of its rights or obligations under this Agreement or any other Transaction Document to any other Person without the prior written consent of the other Parties to this Agreement or other Transaction Documents, as applicable, and any such attempted or purported assignment will be null and void; provided, however, that Buyer may, without consent, assign all or part of its rights under this Agreement or other Transaction Document to (a) one or more of its Affiliates (including a Designated Buyer); and (b) a purchaser of all or a substantial portion of the capital stock or assets of Buyer following the Closing.

Section 8.2 **Entire Agreement**. This Agreement and the exhibits to this Agreement and the other Transaction Documents set forth the entire agreement and understanding of the Parties in respect of the transactions contemplated by this Agreement or other Transaction Documents, as applicable, and supersede all prior Contracts, letters of intent, exclusivity agreements, and other arrangements and understandings relating to the subject matter hereof and thereof. No representation, promise, inducement or statement of intention has been made by any Party in connection with the transactions contemplated by this Agreement or other Transaction Document that is not embodied in this Agreement or such other Transaction Document, as applicable, and no Party will be bound by or liable for any alleged representation, promise, inducement or statement of intention not so embodied.

Section 8.3 **Amendment and Waiver**. This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the Parties or, in the case of a waiver, by or on behalf of the Party waiving compliance; subject, in the case of any amendment and any waiver by Seller, to the written consent of the Bank. The failure of any Party at any time to require performance of any provision of this Agreement will in no manner affect the right of that Party at a later time to enforce such provision. No waiver by any Party of any condition or the Breach of any term, covenant, representation or warranty in this Agreement, in any one or more instances, will be deemed to be or construed as a further or continuing waiver of such condition or Breach, or any other condition, term, covenant, representation or warranty in this Agreement.

Section 8.4 **Governing Law; Exclusive Jurisdiction**. This Agreement will be governed by and construed in accordance with the applicable Legal Requirements of the State of New York, without regard to conflicts of laws principles. Any Action seeking to enforce any provision of, or based on any right arising out of, this Agreement or any other Transaction Document may only be brought in the Bankruptcy Court, and each Party hereby irrevocably consents to the jurisdiction of such court (and of the appropriate appellate courts) in any such Action and waives any objection to venue laid therein. Process in any Action referred to in the preceding sentence may be served on a Party anywhere in the world.

Section 8.5 **Notices**. All notices, requests, demands and other communications required to be given pursuant to this Agreement will be in writing and will be deemed to have been duly given on the day of delivery if delivered by hand, on the first Business Day following delivery if sent by facsimile with confirmation, on the first Business Day following deposit with a nationally recognized overnight mail service, or on the third Business Day following first class mailing, with first class, postage prepaid:

| If to Buyer: | with a copy to: |
|---|---|
| Herff Jones, Inc.<br>4625 W. 62nd Street<br>Indianapolis, IN 46268<br>Attn: Bruce H. Alfreds<br>Facsimile: (317) 612-3494<br>Email: bhalfreds@herffjones.com | Barnes & Thornburg, LLP<br>11 South Meridian Street<br>Indianapolis, IN 46204<br>Attn: Eric R. Moy<br>Facsimile: (317) 231-7433<br>Email: eric.moy@btlaw.com |
| If to Seller: | with a copy to: |
| Greg and Roxanne Davis<br>Yearbook Photography<br>  of Mamaroneck, Inc.<br>D/B/A Davis Studio<br>155 White Plains Road<br>Tarrytown, NY 10591<br>Facsimile:<br>Email: Roxanne@davisstudio.com | Rattet, Pasternak & Gordon-Oliver LLP<br>550 Mamaroneck Avenue<br>Suite 510<br>Harrison, NY 10528<br>Attn: Jonathan S. Pasternak<br>Facsimile: (914) 381-7406<br>Email: jpasternak@rattetlaw.com |

A Party may change its or his address, telephone number or facsimile number by prior written notice to the other Parties.

Section 8.6 **Counterparts; Electronic Delivery**.   This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, may be executed in one or more counterparts, all of which will constitute one and the same instrument. Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf or similar attachment to electronic mail (any such delivery, an "**Electronic Delivery**") will be treated in all manner and respects as an original executed counterpart and will be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

Section 8.7 **Fees and Expenses**.   Except as otherwise expressly provided in this Agreement or an Order of the Bankruptcy Court regarding the Auction or related sale procedures, each Party will be responsible for and will pay its own legal, accounting, and other fees and expenses, including reasonable attorneys' and accountants' fees and expenses and expenses of financial consultants, investment bankers, or lenders, incurred in connection with the transactions contemplated hereby.

Section 8.8 **Headings; Construction; Time of Essence**.   The headings of the articles, sections and paragraphs in this Agreement have been inserted for convenience of reference only and will not restrict or otherwise modify any of the terms or provisions of this Agreement. Unless otherwise expressly provided, the words "including," "include" or "includes," or other similar words, whenever used in this Agreement will be deemed to be immediately followed by the words "without limitation". With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence. References in this Agreement to any gender include references to all genders, and references to the singular include references to the plural and vice versa. Neither this Agreement nor any other Transaction Document (nor any uncertainty or ambiguity herein or therein) will be construed against any Party under any rule of construction or otherwise.

Section 8.9 **Partial Invalidity**.   Whenever possible, each provision of this Agreement and each other Transaction Document will be interpreted in such manner as to be effective and valid under applicable Legal Requirements, but in case any one or more of the provisions contained in this Agreement or other Transaction Document is, for any reason, held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provision of this Agreement or other Transaction Document, as applicable, and this Agreement or other Transaction Document will be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein or therein unless the deletion of such provision or provisions would result in such a material change as to cause completion of the transactions contemplated hereby or thereby to be unreasonable. If the deemed deletion of the invalid, illegal or unenforceable provision or provisions is reasonably likely to have a material adverse effect on a Party, all Parties will endeavor in good faith to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as practicable to that of the invalid, illegal or unenforceable provisions.

[Signature PagesFollows]

22

The Parties have executed this Asset Purchase Agreement as of the date stated in the first paragraph of this Asset Purchase Agreement.

**"Buyer"**

HERFF JONES, INC.

By: /s/ Bruce Alfreds

Its: Vice-President5

**"Seller"**

YEARBOOK PHOTOGRAPHY OF MAMARONECK. INC., d/b/a DAVIS STUDIO

By: /s/ Roxanne Davis

Its: Vice-President

INDS02 1108861v6

# EMPLOYMENT AND NON-COMPETITION AGREEMENT

This EMPLOYMENT AND NON-COMPETITION AGREEMENT (this "**Agreement**") is made as of the [ ● ] day of June, 2010 (the "**Effective Date**") by and between HERFF JONES, INC., an Indiana corporation ("**Employer**") and GREG DAVIS ("**Employee**"), hereinafter collectively referred to as the **Parties**.

## RECITALS

WHEREAS, Employee is a principal officer, director and shareholder of YEARBOOK PHOTOGRAPHY OF MAMARONECK, INC., d/b/a Davis Studio, a New York corporation ("**Davis Studio**"); and

WHEREAS, Davis Studio is engaged in the business of providing portrait, candid and digital photography services to nursery, elementary, middle and high schools and colleges and universities throughout the New York Metropolitan area (the "**Business**"); and

WHEREAS, concurrently with the execution and delivery of this Agreement, Employer is purchasing the Purchased Assets (as defined therein) of the Business pursuant to the terms and conditions of an Asset Purchase Agreement between Employer and Davis Studio, dated as of the date hereof (the "**Asset Purchase Agreement**"); and

WHEREAS, concurrently with the execution and delivery of this Agreement, Employer is entering into an Employment and Non-Competition Agreement with Roxanne Davis, dated as of the date hereof (the "**Roxanne Davis Employment Agreement**"); and

WHEREAS, Employer desires to employ Employee and Employee desires to serve in the employ of Employer pursuant to the terms and conditions herein; and

WHEREAS, Employee was personally involved in developing Davis Studio's goodwill and customer relationships acquired by Employer; and

WHEREAS, as an employee of the Employer, Employee will be introduced or exposed to customers of Employer and to its trade secrets and confidential business information; and

WHEREAS, Employer further desires to protect the ongoing customer relationships and confidential or proprietary information it acquired from Davis Studio and protect itself against unfair competition from employees during and after their employment.

NOW, THEREFORE, in consideration of the promises and the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree as follows:

## AGREEMENT

1.    **Employment.**   Employer hereby employs Employee, and Employee hereby accepts employment by Employer, upon the terms and conditions set forth in this Agreement.

Notwithstanding anything herein to the contrary, Employee and Employer agree that if the Asset Purchase Agreement does not proceed to Closing, as defined therein and by the deadline specified therein, then this Agreement is null and void ab initio.

2. **Employment Period.** The term of Employee's employment under this Agreement will begin on the Effective Date and shall continue until June 30, 2013, unless terminated earlier as provided herein (the "**Employment Period**").

3. **Exclusive Employment.** Employee shall devote his best efforts and full time, attention, and energies to performing Employee's duties and services hereunder for the exclusive benefit of Employer. Employee shall not take advantage of any business opportunities that arise during his employment that may benefit Employer, whether for the benefit of Employee or any person or entity other than Employer, and all material facts regarding any such opportunities shall be promptly reported to the Chief Executive Officer of Employer for consideration by Employer. During his employment, Employee shall maintain loyalty to Employer and shall not knowingly or intentionally take action that may, directly or indirectly, promote the interests of any competitor or injure the interests of Employer. Notwithstanding the foregoing, Employee may engage in civic or charitable activities which do not unreasonably interfere with the performance of Employee's duties hereunder; provided that Employee first discloses any such activities to Employer, and Employee's continued participation in those activities shall be subject to Employer's ongoing approval.

4. **Termination.** Employee's employment, Employee's right to compensation, and any and all other rights of Employee under this Agreement or otherwise as an employee of Employer will terminate upon:

(a) The conviction of or plea of guilty or no contest by Employee of: (i) any crime constituting a felony; (ii) any crime involving moral turpitude or fraud or embezzlement; or (iii) any crime involving controlled substances;

(b) Conduct on the part of Employee which is materially disruptive to the duties performed by Employee under this Agreement;

(c) Employee's material breach of this Agreement if, after written notice to Employee by Employer that Employee has breached any provision of this Agreement, such breach shall remain uncured for a period of 30 days following notice from Employer specifying such breach;

(d) The death or permanent disability of Employee with such permanent disability being defined to mean any one hundred twenty (120) consecutive day period where Employee is unable to perform the duties described in this Agreement;

(e) Employee's voluntary termination of employment or resignation; or

(f) Employer's termination of Employee's employment without "cause", for any reason or for no reason, effective immediately upon notice from Employer to the Employee, or at such later time as such notice may specify. As used herein,

"cause" means Employer's termination of Employee's employment pursuant to Sections 4(a), (b), (c) or (d).

Upon the termination of Employee's employment "for cause" pursuant to Sections 4(a), (b), (c), or (d) above, or upon Employee's voluntary termination of employment or resignation pursuant to Section 4(e), Employer will be obligated to pay Employee (or, in the event of his death, his designated beneficiary) only Employee's earned and unpaid Salary and Benefits through the date of termination. Upon the termination of Employee's employment by Employer without "cause" pursuant to Section 4(f), above, Employer will be obligated to pay Employee Employee's earned and unpaid Salary and Benefits through the date of termination, and, in addition, Employer shall pay Employee severance compensation in an amount equal to Employee's Salary (at the monthly rate in effect at the date of termination) for a period of six months following the date of termination (subject to applicable withholding taxes) payable in periodic installments consistent with Employer's payroll practices for a period of six months following termination.

5. **Duties.** Employee will oversee Employer's photography operations in Tarrytown, New York, and will have such other duties as are assigned or delegated to Employee by Employer from time to time. Employee will initially serve as the Territory Sales Manager in Tarrytown, New York, and will report to the Eastern Regional Sales Manager of the Photography Division of Employer. Employee will devote his full business time, attention, skill, and energy exclusively to the business of Employer, will use his best efforts to promote the success of Employer's business, and will cooperate fully with Employer in the advancement of the best interests of Employer.

6. **Compensation/Consideration.** Employee will be paid an annual salary of $75,000 per year ("**Salary**") during the Employment Period, which will be payable in equal periodic installments according to Employer's customary payroll practices. Employee will, during the Employment Period, be permitted to participate in such employee benefit plans of the Employer that may be in effect from time to time, to the extent the Employee is eligible under the terms of those plans (collectively, the "**Benefits**").

7. **Expenses**. Employer shall reimburse Employee for reasonable travel, lodging, and other related out-of-pocket expenses reasonably incurred by Employee in the performance of Employee's duties as provided herein, subject to Employer's policies of expense reimbursement as may be in effect from time to time. Employee shall provide Employer adequate documentation of such expenses at the request of Employer.

8. **Additional Compensation.** As additional consideration for Employee's covenants contained herein, Employee shall be entitled to an annual bonus payment equal to one and a quarter percent (1.25%) (the "**Bonus Percentage**") of the Net Sales of the Business for each of Employer's fiscal years (fiscal 2011, 2012 and 2013) during the Employment Period. "**Net Sales of the Business**" means the gross customer sales of Employer to or through (i) customers identified on the Customer List (as such term is defined in the Asset Purchase Agreement), and (ii) any new customers or customer accounts of Buyer for which Employee has direct oversight or responsibility. In each such case, to determine Net Sales of the Business, all gross sales specified above shall be reduced by the amount of included taxes, customer commissions, returns and allowances. Employee shall not be entitled to any bonus payment for

any fiscal year under this Paragraph 8 unless Employee has been employed by Employer for such entire fiscal year through June 30 of such fiscal year. Notwithstanding the foregoing, should Employer terminate the Roxanne Davis Employment Agreement in the event of Roxanne Davis' death or permanent disability pursuant to Section 4(d) of the Roxanne Davis Employment Agreement, the Bonus Percentage shall be increased to two and a half percent (2.5), prorated from the date of termination of the Roxanne Davis Employment Agreement, during the remainder of the Employment Period. In addition, to the extent Employer pays customers more than $350,000 in respect of rebates that are accrued on the books of Davis Studio as of the date of the Asset Purchase Agreement (including any Pre-Closing Payments, as defined in the Asset Purchase Agreement), Employee's bonus payments shall be reduced by an amount equal to 50% of such excess.

9. **Non-Competition.** During his employment (regardless whether such employment continues beyond the initial Employment Period), Employee shall not, directly or indirectly, have any ownership interest in, work for, advise, manage, act as an agent or consultant for, or have any business connection or business or employment relationship with any entity or person which competes with Employer. Moreover, for a period of twelve (12) months after Employee's separation from Employer for any reason (collectively with the period during which Employee is employed by Employer, referred to as the "**Restricted Period**"), Employee shall not:

    (a)    in or from the geographic area in which Employer operates during Employee's employment with Employer; or

    (b)    in or from the geographic area in which Employee has been performing services on behalf of Employer, or for which Employee has been assigned responsibility, at any time within one (1) year preceding Employee's separation;

directly or indirectly own, manage, finance, operate, control or participate in ownership, management, or operation of, act as an agent, consultant, or be employed in a competitive capacity with, any business engaged in the development, production, marketing, sale or servicing of any service or product (i) with which Employee was involved during his last year of employment with Employer, or (ii) which Employer is developing, producing, marketing, selling or servicing (or plans to develop, produce, market, sale or service) and about which Employee gained any confidential or proprietary information in the course of his employment with Employer.

10. **Non-Solicitation of Other Employees.** During the Restricted Period, Employee will not directly or indirectly encourage, solicit, induce, or attempt to encourage, solicit or induce any other employee, agent or representative of Employer to leave his/her employment (or terminate his/her relationship) with Employer (or devote less than full time efforts to Employer's business), and Employee will not directly or indirectly hire or attempt to hire, for any competitive or other position with any competitor or other business, any person who is an employee, agent or representative of Employer at such time (or who has been an employee, agent or representative of Employer at any time within the preceding 180 days).

11. **Non-Interference.** During the Restricted Period, Employee will not request or advise any customer of Employer, or any person or entity having business dealings with Employer, to withdraw, curtail, or cease such business with Employer.

12. **Non-Solicitation of Customers.** During the Restricted Period, Employee will not in a competitive capacity, on behalf of any person or entity other than Employer, directly or indirectly:

      (a)    solicit, divert (or attempt to solicit or divert) or accept business from any customer of Employer;

      (b)    solicit, divert (or attempt to solicit or divert) or accept business from any customer of Employer with whom Employee has had contact (either directly or indirectly) or over which Employee has had responsibility at any time in the one (1) year preceding his separation, or about whom Employee has obtained confidential or proprietary information;

      (c)    solicit, divert (or attempt to solicit or divert) or accept business from any identified prospective customer of Employer; or

      (d)    solicit, divert (or attempt to solicit or divert) or accept business from any identified prospective customer of Employer with whom Employee has had contact (either directly or indirectly) or over which Employee has had responsibility at any time in the one (1) year preceding Employee's separation, or about whom Employee has obtained confidential or proprietary information.

13. **Other Disruption or Injury.** Employee agrees to not knowingly or intentionally commit any act to disrupt the business of the Employer or its affiliates in any way whatsoever and further agrees to not willfully commit any act, or in any way assist others to commit any act, for the purposes of injuring the Employer in any manner whatsoever.

14. **No Defense for Alleged Breach.** Paragraphs 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20 shall be construed as independent of any other provision of this Agreement and shall survive the termination of this Agreement. The existence of any claim or cause of action by Employee against the Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Employer of these paragraphs.

15. **Tolling in Case of Breach.** The Employee acknowledges that the Restricted Period is a material element of this Agreement and that the Employer is entitled to his compliance with the terms of this Agreement during that full period of time. Therefore, Employee agrees that the Restricted Period of time is tolled during any period of non-compliance. Employee further agrees that if the Employer must seek injunctive relief or judicial intervention, the Restricted Period set forth herein does not commence until he is judged by a court of competent jurisdiction to be in full compliance with this Agreement.

16. **Inequitable Disclosure.** Employee acknowledges and agrees that after his separation of employment, Employee will possess Employer's trade secrets and confidential information which he would inevitably use if he were to engage in conduct prohibited above, that

such use would be unfair, and extremely detrimental, to Employer and, in view of the benefits provided to Employee in this Agreement, that such conduct on Employee's part would be inequitable. Accordingly, Employee separately and severally agrees for the benefit of Employer to keep each of the covenants described above throughout the Restricted Period.

17. **Non-Disclosure of Proprietary and Confidential Information.** Employee hereby acknowledges and agrees that as a result of Employee's employment by Employer, Employee will have access to and be involved in the development and/or utilization of Employer's (and its parent's, affiliates' and/or subsidiaries') confidential and proprietary business information. Accordingly, Employee hereby agrees that he shall not, either during employment by Employer or at any time thereafter, disclose to anyone (except as authorized by Employer in the furtherance of its business), publish, or use in competition with Employer, any of Employer's (or its parent's, affiliates' and/or subsidiaries') confidential and proprietary information. Employer's (and its parent's, affiliates' and/or subsidiaries') confidential and proprietary information is defined to include the following: (a) any information that would be considered a Trade Secret as that phrase is defined by Indiana law; (b) information relating to any of Employer's existing projects under development that is not readily available to the competition and therefore gives Employer a competitive advantage in the marketplace; (c) business information, such as business methods, legal strategies, regulatory strategies, engineering methods, accounting methods, and the financial terms and conditions of Employer' dealings with its customers, (d) confidential customer or prospect lists; (e) costs and profit margins; (f) confidential marketing or advertising programs; (g) financial information not generally available to the public; (h) nonpublic sales performance and strategies; (i) merger and/or acquisition plans; and (j) confidential information about Employer's services, products, processes, research, improvements, discoveries, methods, formulas and inventions. Confidential and proprietary business information does not include (i) information that is now or subsequently becomes generally publicly known, other than as a result of the breach of this Agreement, (ii) is independently made available to Employee in good faith by a third party who, to the Employee's knowledge, has not violated a confidential relationship with Employer, or (iii) is required to be disclosed by law or legal process. Employee further agrees to abide by Employer's standards, rules or regulations it may implement from time to time to further protect its confidential information. In the event Employee is compelled by court order or legal process to disclose any confidential information or provide testimony regarding Employer or its products, he shall, to the extent legally permissible, immediately notify Employer of the court order and/or legal process by faxing it to Kevin M. Jardina at (317) 612-____ so that Employer may elect to take appropriate action to obtain a protective order to prevent the disclosure of its confidential information.

18. **Assignment of Rights to Intellectual Property.** Any discovery, design, invention, or improvement (whether or not patentable), which Employee develops solely or jointly with others while performing the duties specified hereunder, whether or not developed on Employer's premises, and that falls within the scope of Employer's business activities as then conducted or contemplated, shall belong to Employer and shall be promptly disclosed by Employee to Employer. Employee agrees to execute and deliver to Employer any instruments of transfer and take any other action that Employer may request to carry out the provisions of this Section, including executing and filing, at Employer's expense, patent or copyright applications

and other documents reasonably required for the protection of anything covered by this Section and assigning the applications to Employer.

19. **Return of Property.** Employee agrees that upon termination of employment, or immediately upon demand from Employer, Employee shall return all Employer materials, including but not limited to, programs, blueprints, manuals, letters, reports, input and output data, memos, drawings or diagrams, advertising and marketing information, customer lists, consumer information, samples of work product, business plans, financial plans, computer access codes or disks, formulas, and any other property that he received in connection with his relationship with Employer, including all confidential and proprietary information as defined above. Employee further agrees that he will not retain any copies, duplicates, reproduction or excerpts of the above-referenced materials and that he will not provide the originals or any copies of Employer's materials to any other person prior to returning said materials in accordance with the terms of this Agreement.

20. **Injunction and Damages.** Employee acknowledges that a breach of any provision of this Agreement by Employee would cause irreparable injury or damage to Employer, that it would be difficult to calculate damages for Employee's breach of this Agreement and that Employer will not have an adequate remedy at law. Therefore, Employee agrees to and does hereby waive any claim that Employer has an adequate remedy at law and further agrees that Employer shall be entitled, if it so elects, to institute and prosecute proceedings in a court of competent jurisdiction to obtain temporary, preliminary, and/or permanent injunctive relief to enforce any provision of this Agreement without the necessity of proof of actual injury or damage, and without the necessity of posting any security. Employee further acknowledges that if Employer prevails in any litigation regarding this Agreement, Employer is entitled to recover its costs, expenses and reasonable attorneys' fees incurred in enforcement.

21. **Waiver of Breach.** The waiver by one party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach by the other party.

22. **Severability.** The Parties expressly agree that the terms of this Agreement are reasonable, enforceable, and necessary to protect Employer's interests and will not affect Employee's ability to earn a livelihood. In the unlikely event, however, that a court determines that any of the terms, provisions, or covenants contained in this Agreement are unreasonable, the court shall limit the application of such term, provision, or covenant, or modify any such term, provision, or covenant and proceed to enforce the Agreement as so limited or modified. Consequently, if any provision of this Agreement is determined to be unenforceable, the remaining provisions shall remain in full force and effect. The Parties further agree that if any provision is susceptible of two or more constructions, one of which would render the provision unenforceable, then the provision shall be construed to have the meaning that renders it enforceable.

23. **Governing Law.** This Agreement shall be governed by the laws of the State of Indiana regardless of the principles of conflict of laws.

24. **Choice of Forum.** The Employer is headquartered in Indiana, and Employee understands and acknowledges the Employer's desire and need to defend any litigation against it in Indiana. Accordingly, the Parties agree that any claim brought by the Employee against the Employer or any of its employees or agents must be maintained only in a court sitting in Marion County, Indiana, or if a federal court, the Southern District of Indiana, Indianapolis Division.

The Employee further understands and acknowledges that in the event the Employer initiates litigation against the Employee, the Employer may need to prosecute such litigation in the State of Indiana or in such other states or countries where Employee is subject to personal jurisdiction. Accordingly, the Parties agree that the Employer can pursue any claim against the Employee in any forum in which the Employee is subject to personal jurisdiction. The Employee specifically consents to personal jurisdiction in the State of Indiana.

25. **Notices.** Any notice, request, claim, demand, document and other communication hereunder to any party shall be effective upon mailing and shall be in writing and delivered personally or sent by telex, telecopy, or certified or registered mail, postage prepaid, as follows:

In the case of Herff Jones, to:

> Herff Jones, Inc.
> 4625 West 62nd Street
> Indianapolis, Indiana 46268
> Attention: Bruce H. Alfreds
> Fax: (317) 612-3494
> Email Address: bhalfreds@herff-jones.com

With a copy to:

> Barnes & Thornburg LLP
> 11 South Meridian Street
> Indianapolis, Indiana 46204
> Attention: Eric R. Moy
> Fax: 317-231-7433
> Email Address: eric.moy@btlaw.com

In the case of Employee, to:

> Greg Davis
>
> _____
> _____

With a copy (which shall not constitute notice) to:

> _____
> _____
> _____

or at such other address and number as any party shall have previously designated by written notice given to the other parties in the manner hereinabove set forth.

26. **Entire Agreement.** The Asset Purchase Agreement and this Agreement contain the entire agreement of the Parties relating to the subject matter hereof. Any modification or amendment of the terms of this Agreement shall be in writing signed by the Parties hereto.

27. **Binding Effect; Survival.** This Agreement shall be binding upon the parties hereto, their successors and assigns, and to the estate, heirs, legatees, executors, administrators and beneficiaries of Employer. No right, benefit or obligation of Employee hereunder may be assigned or assumed to or by any third party without Employer's written consent. The Employer may unilaterally assign this Agreement to a related entity, a successor or an assign. If Employee's employment hereunder expires or is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Employee in Paragraphs 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20 hereof.

26. **Counterparts**. This Agreement may be executed in one or more counterparts and delivered by facsimile or other means of electronic communication, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

[SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

EXECUTED as of the date first above written.

HERFF JONES, INC.

By: _____

Printed: Bruce H. Alfreds

Title: Vice President of Business Development

_____
Greg Davis

# EMPLOYMENT AND NON-COMPETITION AGREEMENT

This EMPLOYMENT AND NON-COMPETITION AGREEMENT (this "**Agreement**") is made as of the [ • ] day of June, 2010 (the "**Effective Date**") by and between HERFF JONES, INC., an Indiana corporation ("**Employer**") and ROXANNE DAVIS ("**Employee**"), hereinafter collectively referred to as the **Parties**.

## RECITALS

WHEREAS, Employee is a principal officer, director and shareholder of YEARBOOK PHOTOGRAPHY OF MAMARONECK, INC., d/b/a Davis Studio, a New York corporation ("**Davis Studio**"); and

WHEREAS, Davis Studio is engaged in the business of providing portrait, candid and digital photography services to nursery, elementary, middle and high schools and colleges and universities throughout the New York Metropolitan area (the "**Business**"); and

WHEREAS, concurrently with the execution and delivery of this Agreement, Employer is purchasing the Purchased Assets (as defined therein) of the Business pursuant to the terms and conditions of an Asset Purchase Agreement between Employer and Davis Studio, dated as of the date hereof (the "**Asset Purchase Agreement**"); and

WHEREAS, concurrently with the execution and delivery of this Agreement, Employer is entering into an Employment and Non-Competition Agreement with Greg Davis, dated as of the date hereof (the "**Greg Davis Employment Agreement**"); and

WHEREAS, Employer desires to employ Employee and Employee desires to serve in the employ of Employer pursuant to the terms and conditions herein; and

WHEREAS, Employee was personally involved in developing Davis Studio's goodwill and customer relationships acquired by Employer; and

WHEREAS, as an employee of the Employer, Employee will be introduced or exposed to customers of Employer and to its trade secrets and confidential business information; and

WHEREAS, Employer further desires to protect the ongoing customer relationships and confidential or proprietary information it acquired from Davis Studio and protect itself against unfair competition from employees during and after their employment.

NOW, THEREFORE, in consideration of the promises and the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree as follows:

## AGREEMENT

1.   **Employment.**   Employer hereby employs Employee, and Employee hereby accepts employment by Employer, upon the terms and conditions set forth in this Agreement.

Notwithstanding anything herein to the contrary, Employee and Employer agree that if the Asset Purchase Agreement does not proceed to Closing, as defined therein and by the deadline specified therein, then this Agreement is null and void ab initio.

2. **Employment Period.** The term of Employee's employment under this Agreement will begin on the Effective Date and shall continue until June 30, 2013, unless terminated earlier as provided herein (the "**Employment Period**").

3. **Exclusive Employment.** Employee shall devote her best efforts and full time, attention, and energies to performing Employee's duties and services hereunder for the exclusive benefit of Employer. Employee shall not take advantage of any business opportunities that arise during her employment that may benefit Employer, whether for the benefit of Employee or any person or entity other than Employer, and all material facts regarding any such opportunities shall be promptly reported to the Chief Executive Officer of Employer for consideration by Employer. During her employment, Employee shall maintain loyalty to Employer and shall not knowingly or intentionally take action that may, directly or indirectly, promote the interests of any competitor or injure the interests of Employer. Notwithstanding the foregoing, Employee may engage in civic or charitable activities which do not unreasonably interfere with the performance of Employee's duties hereunder; provided that Employee first discloses any such activities to Employer, and Employee's continued participation in those activities shall be subject to Employer's ongoing approval.

4. **Termination.** Employee's employment, Employee's right to compensation, and any and all other rights of Employee under this Agreement or otherwise as an employee of Employer will terminate upon:

(a)   The conviction of or plea of guilty or no contest by Employee of: (i) any crime constituting a felony; (ii) any crime involving moral turpitude or fraud or embezzlement; or (iii) any crime involving controlled substances;

(b)   Conduct on the part of Employee which is materially disruptive to the duties performed by Employee under this Agreement;

(c)   Employee's material breach of this Agreement if, after written notice to Employee by Employer that Employee has breached any provision of this Agreement, such breach shall remain uncured for a period of 30 days following notice from Employer specifying such breach;

(d)   The death or permanent disability of Employee with such permanent disability being defined to mean any one hundred twenty (120) consecutive day period where Employee is unable to perform the duties described in this Agreement;

(e)   Employee's voluntary termination of employment or resignation; or

(f)   Employer's termination of Employee's employment without "cause", for any reason or for no reason, effective immediately upon notice from Employer to the Employee, or at such later time as such notice may specify. As used herein,

"cause" means Employer's termination of Employee's employment pursuant to Sections 4(a), (b), (c) or (d).

Upon the termination of Employee's employment "for cause" pursuant to Sections 4(a), (b), (c), or (d) above, or upon Employee's voluntary termination of employment or resignation pursuant to Section 4(e), Employer will be obligated to pay Employee (or, in the event of her death, her designated beneficiary) only Employee's earned and unpaid Salary and Benefits through the date of termination. Upon the termination of Employee's employment by Employer without "cause" pursuant to Section 4(f), above, Employer will be obligated to pay Employee Employee's earned and unpaid Salary and Benefits through the date of termination, and, in addition, Employer shall pay Employee severance compensation in an amount equal to Employee's Salary (at the monthly rate in effect at the date of termination) for a period of six months following the date of termination (subject to applicable withholding taxes) payable in periodic installments consistent with Employer's payroll practices for a period of six months following termination.

5. **Duties.** Employee will oversee Employer's photography operations in Tarrytown, New York, and will have such other duties as are assigned or delegated to Employee by Employer from time to time. Employee will initially serve as the Territory Sales Manager in Tarrytown, New York, and will report to the Eastern Regional Sales Manager of the Photography Division of Employer. Employee will devote her full business time, attention, skill, and energy exclusively to the business of Employer, will use her best efforts to promote the success of Employer's business, and will cooperate fully with Employer in the advancement of the best interests of Employer.

6. **Compensation/Consideration.** Employee will be paid an annual salary of $75,000 per year ("**Salary**") during the Employment Period, which will be payable in equal periodic installments according to Employer's customary payroll practices. Employee will, during the Employment Period, be permitted to participate in such employee benefit plans of the Employer that may be in effect from time to time, to the extent the Employee is eligible under the terms of those plans (collectively, the "**Benefits**").

7. **Expenses**. Employer shall reimburse Employee for reasonable travel, lodging, and other related out-of-pocket expenses reasonably incurred by Employee in the performance of Employee's duties as provided herein, subject to Employer's policies of expense reimbursement as may be in effect from time to time. Employee shall provide Employer adequate documentation of such expenses at the request of Employer.

8. **Additional Compensation.** As additional consideration for Employee's covenants contained herein, Employee shall be entitled to an annual bonus payment equal to one and a quarter percent (1.25%) (the "**Bonus Percentage**") of the Net Sales of the Business for each of Employer's fiscal years (fiscal 2011, 2012 and 2013) during the Employment Period. "**Net Sales of the Business**" means the gross customer sales of Employer to or through (i) customers identified on the Customer List (as such term is defined in the Asset Purchase Agreement), and (ii) any new customers or customer accounts of Buyer for which Employee has direct oversight or responsibility. In each such case, to determine Net Sales of the Business, all gross sales specified above shall be reduced by the amount of included taxes, customer commissions, returns and allowances. Employee shall not be entitled to any bonus payment for

any fiscal year under this Paragraph 8 unless Employee has been employed by Employer for such entire fiscal year through June 30 of such fiscal year. Notwithstanding the foregoing, should Employer terminate the Greg Davis Employment Agreement in the event of Greg Davis' death or permanent disability pursuant to Section 4(d) of the Greg Davis Employment Agreement, the Bonus Percentage shall be increased to two and a half percent (2.5), prorated from the date of termination of the Greg Davis Employment Agreement, during the remainder of the Employment Period. In addition, to the extent Employer pays customers more than $350,000 in respect of rebates that are accrued on the books of Davis Studio as of the date of the Asset Purchase Agreement (including any Pre-Closing Payments, as defined in the Asset Purchase Agreement), Employee's bonus payments shall be reduced by an amount equal to 50% of such excess.

9. **Non-Competition.** During her employment (regardless whether such employment continues beyond the initial Employment Period), Employee shall not, directly or indirectly, have any ownership interest in, work for, advise, manage, act as an agent or consultant for, or have any business connection or business or employment relationship with any entity or person which competes with Employer. Moreover, for a period of twelve (12) months after Employee's separation from Employer for any reason (collectively with the period during which Employee is employed by Employer, referred to as the "**Restricted Period**"), Employee shall not:

> (a) in or from the geographic area in which Employer operates during Employee's employment with Employer; or

> (b) in or from the geographic area in which Employee has been performing services on behalf of Employer, or for which Employee has been assigned responsibility, at any time within one (1) year preceding Employee's separation;

directly or indirectly own, manage, finance, operate, control or participate in ownership, management, or operation of, act as an agent, consultant, or be employed in a competitive capacity with, any business engaged in the development, production, marketing, sale or servicing of any service or product (i) with which Employee was involved during her last year of employment with Employer, or (ii) which Employer is developing, producing, marketing, selling or servicing (or plans to develop, produce, market, sale or service) and about which Employee gained any confidential or proprietary information in the course of her employment with Employer.

10. **Non-Solicitation of Other Employees.** During the Restricted Period, Employee will not directly or indirectly encourage, solicit, induce, or attempt to encourage, solicit or induce any other employee, agent or representative of Employer to leave his/her employment (or terminate his/her relationship) with Employer (or devote less than full time efforts to Employer's business), and Employee will not directly or indirectly hire or attempt to hire, for any competitive or other position with any competitor or other business, any person who is an employee, agent or representative of Employer at such time (or who has been an employee, agent or representative of Employer at any time within the preceding 180 days).

11. **Non-Interference.** During the Restricted Period, Employee will not request or advise any customer of Employer, or any person or entity having business dealings with Employer, to withdraw, curtail, or cease such business with Employer.

12. **Non-Solicitation of Customers.** During the Restricted Period, Employee will not in a competitive capacity, on behalf of any person or entity other than Employer, directly or indirectly:

    (a) solicit, divert (or attempt to solicit or divert) or accept business from any customer of Employer;

    (b) solicit, divert (or attempt to solicit or divert) or accept business from any customer of Employer with whom Employee has had contact (either directly or indirectly) or over which Employee has had responsibility at any time in the one (1) year preceding her separation, or about whom Employee has obtained confidential or proprietary information;

    (c) solicit, divert (or attempt to solicit or divert) or accept business from any identified prospective customer of Employer; or

    (d) solicit, divert (or attempt to solicit or divert) or accept business from any identified prospective customer of Employer with whom Employee has had contact (either directly or indirectly) or over which Employee has had responsibility at any time in the one (1) year preceding Employee's separation, or about whom Employee has obtained confidential or proprietary information.

13. **Other Disruption or Injury.** Employee agrees to not knowingly or intentionally commit any act to disrupt the business of the Employer or its affiliates in any way whatsoever and further agrees to not willfully commit any act, or in any way assist others to commit any act, for the purposes of injuring the Employer in any manner whatsoever.

14. **No Defense for Alleged Breach.** Paragraphs 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20 shall be construed as independent of any other provision of this Agreement and shall survive the termination of this Agreement. The existence of any claim or cause of action by Employee against the Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Employer of these paragraphs.

15. **Tolling in Case of Breach.** The Employee acknowledges that the Restricted Period is a material element of this Agreement and that the Employer is entitled to her compliance with the terms of this Agreement during that full period of time. Therefore, Employee agrees that the Restricted Period of time is tolled during any period of non-compliance. Employee further agrees that if the Employer must seek injunctive relief or judicial intervention, the Restricted Period set forth herein does not commence until she is judged by a court of competent jurisdiction to be in full compliance with this Agreement.

16. **Inequitable Disclosure.** Employee acknowledges and agrees that after her separation of employment, Employee will possess Employer's trade secrets and confidential information which he would inevitably use if he were to engage in conduct prohibited above, that

such use would be unfair, and extremely detrimental, to Employer and, in view of the benefits provided to Employee in this Agreement, that such conduct on Employee's part would be inequitable. Accordingly, Employee separately and severally agrees for the benefit of Employer to keep each of the covenants described above throughout the Restricted Period.

17. **Non-Disclosure of Proprietary and Confidential Information.** Employee hereby acknowledges and agrees that as a result of Employee's employment by Employer, Employee will have access to and be involved in the development and/or utilization of Employer's (and its parent's, affiliates' and/or subsidiaries') confidential and proprietary business information. Accordingly, Employee hereby agrees that he shall not, either during employment by Employer or at any time thereafter, disclose to anyone (except as authorized by Employer in the furtherance of its business), publish, or use in competition with Employer, any of Employer's (or its parent's, affiliates' and/or subsidiaries') confidential and proprietary information. Employer's (and its parent's, affiliates' and/or subsidiaries') confidential and proprietary information is defined to include the following: (a) any information that would be considered a Trade Secret as that phrase is defined by Indiana law; (b) information relating to any of Employer's existing projects under development that is not readily available to the competition and therefore gives Employer a competitive advantage in the marketplace; (c) business information, such as business methods, legal strategies, regulatory strategies, engineering methods, accounting methods, and the financial terms and conditions of Employer' dealings with its customers, (d) confidential customer or prospect lists; (e) costs and profit margins; (f) confidential marketing or advertising programs; (g) financial information not generally available to the public; (h) nonpublic sales performance and strategies; (i) merger and/or acquisition plans; and (j) confidential information about Employer's services, products, processes, research, improvements, discoveries, methods, formulas and inventions. Confidential and proprietary business information does not include (i) information that is now or subsequently becomes generally publicly known, other than as a result of the breach of this Agreement, (ii) is independently made available to Employee in good faith by a third party who, to the Employee's knowledge, has not violated a confidential relationship with Employer, or (iii) is required to be disclosed by law or legal process. Employee further agrees to abide by Employer's standards, rules or regulations it may implement from time to time to further protect its confidential information. In the event Employee is compelled by court order or legal process to disclose any confidential information or provide testimony regarding Employer or its products, he shall, to the extent legally permissible, immediately notify Employer of the court order and/or legal process by faxing it to Kevin M. Jardina at (317) 612-____ so that Employer may elect to take appropriate action to obtain a protective order to prevent the disclosure of its confidential information.

18. **Assignment of Rights to Intellectual Property.** Any discovery, design, invention, or improvement (whether or not patentable), which Employee develops solely or jointly with others while performing the duties specified hereunder, whether or not developed on Employer's premises, and that falls within the scope of Employer's business activities as then conducted or contemplated, shall belong to Employer and shall be promptly disclosed by Employee to Employer. Employee agrees to execute and deliver to Employer any instruments of transfer and take any other action that Employer may request to carry out the provisions of this Section, including executing and filing, at Employer's expense, patent or copyright applications

and other documents reasonably required for the protection of anything covered by this Section and assigning the applications to Employer.

19.     **Return of Property.**  Employee agrees that upon termination of employment, or immediately upon demand from Employer, Employee shall return all Employer materials, including but not limited to, programs, blueprints, manuals, letters, reports, input and output data, memos, drawings or diagrams, advertising and marketing information, customer lists, consumer information, samples of work product, business plans, financial plans, computer access codes or disks, formulas, and any other property that he received in connection with her relationship with Employer, including all confidential and proprietary information as defined above.  Employee further agrees that she will not retain any copies, duplicates, reproduction or excerpts of the above-referenced materials and that he will not provide the originals or any copies of Employer's materials to any other person prior to returning said materials in accordance with the terms of this Agreement.

20.     **Injunction and Damages.**  Employee acknowledges that a breach of any provision of this Agreement by Employee would cause irreparable injury or damage to Employer, that it would be difficult to calculate damages for Employee's breach of this Agreement and that Employer will not have an adequate remedy at law.  Therefore, Employee agrees to and does hereby waive any claim that Employer has an adequate remedy at law and further agrees that Employer shall be entitled, if it so elects, to institute and prosecute proceedings in a court of competent jurisdiction to obtain temporary, preliminary, and/or permanent injunctive relief to enforce any provision of this Agreement without the necessity of proof of actual injury or damage, and without the necessity of posting any security.  Employee further acknowledges that if Employer prevails in any litigation regarding this Agreement, Employer is entitled to recover its costs, expenses and reasonable attorneys' fees incurred in enforcement.

21.     **Waiver of Breach.**  The waiver by one party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach by the other party.

22.     **Severability.**  The Parties expressly agree that the terms of this Agreement are reasonable, enforceable, and necessary to protect Employer's interests and will not affect Employee's ability to earn a livelihood.  In the unlikely event, however, that a court determines that any of the terms, provisions, or covenants contained in this Agreement are unreasonable, the court shall limit the application of such term, provision, or covenant, or modify any such term, provision, or covenant and proceed to enforce the Agreement as so limited or modified.  Consequently, if any provision of this Agreement is determined to be unenforceable, the remaining provisions shall remain in full force and effect.  The Parties further agree that if any provision is susceptible of two or more constructions, one of which would render the provision unenforceable, then the provision shall be construed to have the meaning that renders it enforceable.

23.     **Governing Law.**  This Agreement shall be governed by the laws of the State of Indiana regardless of the principles of conflict of laws.

24. **Choice of Forum.** The Employer is headquartered in Indiana, and Employee understands and acknowledges the Employer's desire and need to defend any litigation against it in Indiana. Accordingly, the Parties agree that any claim brought by the Employee against the Employer or any of its employees or agents must be maintained only in a court sitting in Marion County, Indiana, or if a federal court, the Southern District of Indiana, Indianapolis Division.

The Employee further understands and acknowledges that in the event the Employer initiates litigation against the Employee, the Employer may need to prosecute such litigation in the State of Indiana or in such other states or countries where Employee is subject to personal jurisdiction. Accordingly, the Parties agree that the Employer can pursue any claim against the Employee in any forum in which the Employee is subject to personal jurisdiction. The Employee specifically consents to personal jurisdiction in the State of Indiana.

25. **Notices.** Any notice, request, claim, demand, document and other communication hereunder to any party shall be effective upon mailing and shall be in writing and delivered personally or sent by telex, telecopy, or certified or registered mail, postage prepaid, as follows:

In the case of Herff Jones, to:

> Herff Jones, Inc.
> 4625 West 62nd Street
> Indianapolis, Indiana 46268
> Attention: Bruce H. Alfreds
> Fax: (317) 612-3494
> Email Address: bhalfreds@herff-jones.com

With a copy to:

> Barnes & Thornburg LLP
> 11 South Meridian Street
> Indianapolis, Indiana 46204
> Attention: Eric R. Moy
> Fax: 317-231-7433
> Email Address: eric.moy@btlaw.com

In the case of Employee, to:

> Greg Davis
>
> _____
> _____

With a copy (which shall not constitute notice) to:

> _____
> _____
> _____

or at such other address and number as any party shall have previously designated by written notice given to the other parties in the manner hereinabove set forth.

26. **Entire Agreement.** The Asset Purchase Agreement and this Agreement contain the entire agreement of the Parties relating to the subject matter hereof. Any modification or amendment of the terms of this Agreement shall be in writing signed by the Parties hereto.

27. **Binding Effect; Survival.** This Agreement shall be binding upon the parties hereto, their successors and assigns, and to the estate, heirs, legatees, executors, administrators and beneficiaries of Employer. No right, benefit or obligation of Employee hereunder may be assigned or assumed to or by any third party without Employer's written consent. The Employer may unilaterally assign this Agreement to a related entity, a successor or an assign. If Employee's employment hereunder expires or is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Employee in Paragraphs 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20 hereof.

26. **Counterparts**. This Agreement may be executed in one or more counterparts and delivered by facsimile or other means of electronic communication, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

[SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

EXECUTED as of the date first above written.

HERFF JONES, INC.

By: _____
Printed:  Bruce H. Alfreds
Title:    Vice President of Business Development

Roxanne Davis

# EXHIBIT B

## Purchase Price Allocation

| | |
|---|---:|
| Inventory | 0 |
| Equipment | 10,000 |
| Intangibles: | |
|     Customer List | 730,000 |
|     Images | 182,000 |
| Goodwill | 0 |
| Purchase Price | 922,000 |

## DAVIS SCHOOL PICTURES
## SCHOOL CONTRACTS

| | |
|---|---|
| CONTRACTS EXPIRED BUT HAVE AUTO RENEW FEATURE | 60 |
| CONTRACTS EXPIRED (NO AUTO RENEW REFERENCE)<br>(COULD INCLUDE SOME SCHOOLS THAT HAVE BEEN LOST) | 102 |
| CONTRACTS WITH LAST YEAR AS 2009-2010 | 153 |
| CONTRACTS WITH LAST YEAR AS 2010-2011 | 107 |
| CONTRACTS WITH LAST YEAR AS 2011-2012 | 72 |
| CONTRACTS WITH LAST YEAR AS 2012-2013 | 21 |
| TOTAL CONTRACTS REVIEWED | 515 |
| TOTAL CONTRACTS PER SUMMARY FROM DAVIS | 553 |

SOURCE OF INFORMATION:

DAVIS STUDIO PERSONNEL PULLED THE LATEST CONTRACT FROM THE SCHOOL FILES.

IF THE CONTRACT IS VERBAL THEN NOTHING WAS PULLED

SOME DISTRICTS IN NEW YORK ARE FORBIDDEN FROM SIGNING A MULTI-YEAR AGREEMENT